# Supreme Court of Florida

_____

No. SC11-1148

_____

**ESTATE OF MICHELLE EVETTE MCCALL, et al.,**
Petitioners,

vs.

**UNITED STATES OF AMERICA,**
Respondent.

[March 13, 2014]

LEWIS, J.

This case is before the Court to answer four questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit that are determinative of a cause pending in that court and for which there appears to be no controlling precedent.  We have jurisdiction.  Art. V, § 3(b)(6), Fla. Const.  In Estate of McCall v. United States, 642 F.3d 944 (11th Cir. 2011), the Eleventh Circuit certified the following questions:

> (1) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT TO EQUAL PROTECTION UNDER ARTICLE I, SECTION 2 OF THE FLORIDA CONSTITUTION?

(2) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT OF ACCESS TO THE COURTS UNDER ARTICLE I, SECTION 21 OF THE FLORIDA CONSTITUTION?

(3) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT TO TRIAL BY JURY UNDER ARTICLE I, SECTION 22 OF THE FLORIDA CONSTITUTION?

(4) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE SEPARATION OF POWERS GUARANTEED BY ARTICLE II, SECTION 3 AND ARTICLE V, SECTION 1 OF THE FLORIDA CONSTITUTION?

Id. at 952-53. Because this case involves a wrongful death, we rephrase the first certified question as follows:

DOES THE STATUTORY CAP ON WRONGFUL DEATH NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT TO EQUAL PROTECTION UNDER ARTICLE I, SECTION 2 OF THE FLORIDA CONSTITUTION?

As explained below, we answer the first rephrased certified question in the affirmative and hold that the cap on wrongful death noneconomic damages provided in section 766.118, Florida Statutes, violates the Equal Protection Clause of the Florida Constitution. We find it unnecessary to answer the remaining certified questions because Florida's Wrongful Death Act is of statutory origin, and the present case is under the Federal Tort Claims Act and its procedures.

**FACTS AND PROCEDURAL HISTORY**

In its opinion, the Eleventh Circuit detailed the facts regarding the legal

action filed by the estate of Michelle McCall, Ms. McCall's parents, and the father of Ms. McCall's son (Petitioners) against the United States:

During June 2005, Michelle McCall received prenatal medical care at a United States Air Force clinic as an Air Force dependent. Ms. McCall opted for the Air Force's family practice department to provide primary prenatal care and delivery services throughout her pregnancy. She had a healthy and normal pregnancy until the last trimester. On February 21, 2006, test results revealed that Ms. McCall's blood pressure was high and that she was suffering from severe preeclampsia. Ms. McCall's serious condition required that labor be induced immediately.

Instead of transferring Ms. McCall to the OB/GYN department, the family practice department continued to provide medical care. The Air Force hospital was temporarily unavailable for obstetric and delivery services, so members of the family practice department transferred Ms. McCall to the Fort Walton Beach Medical Center instead. There, Air Force family practice doctors treated Ms. McCall for hypertension and induced labor. When Ms. McCall dilated to five centimeters, her contractions slowed and became weaker. The Air Force family practice doctors treating Ms. McCall called an Air Force obstetrician, Dr. Archibald, and asked if he could perform a cesarean section. Dr. Archibald reported that he was performing another surgery and would not be available to perform a cesarean section on Ms. McCall until after he finished that surgery. The Air Force family practice doctors prepared Ms. McCall for a cesarean section but did not call other obstetricians to determine if one was available to provide immediate medical care.

On February 22, 2006, Dr. Archibald finally arrived to perform the cesarean section, but Ms. McCall's contractions had resumed and the Air Force family practice doctors decided to allow Ms. McCall to deliver vaginally. Dr. Archibald left the Fort Walton Medical Center. On February 23, 2006 at 1:25 a.m., Ms. McCall delivered a healthy baby boy. Family members who visited Ms. McCall after the delivery expressed concerns about the amount of blood Ms. McCall had lost during delivery. Medical personnel assured these family members that Ms. McCall was stable.

Thirty-five minutes later, when the placenta had not delivered as expected, two family practice doctors from the family practice

department tried without success to manually extract the placenta. An Air Force nurse anesthetist administered additional epidural pain relief and gave Ms. McCall two separate doses of Morphine intravenously. Around 2:35 a.m., the family practice department doctors called Dr. Archibald, the obstetrician, for assistance when they could not remove the placenta manually.

Ms. McCall's blood pressure began to drop rapidly and remained dangerously low over the next two and a half hours. The Air Force nurse anesthetist monitoring Ms. McCall's vital signs did not notify the family practice doctors of the drop in Ms. McCall's blood pressure. Dr. Archibald arrived at 2:45 a.m. and removed the placenta within five minutes. The family practice department doctors informed Dr. Archibald that Ms. McCall had not lost much blood during delivery. Dr. Archibald, however, noticed severe vaginal lacerations and worked to repair them over the next hour. During that time, the Air Force nurse anesthetist monitored Ms. McCall's vital signs, reported to Dr. Archibald that they were stable, and failed to inform him that Ms. McCall's blood pressure was dangerously low and continuing to drop. Dr. Archibald never checked the vital signs himself and relied exclusively on the nurse to inform him of any blood pressure changes or problems.

At 3:50 a.m. when Dr. Archibald finished his work, he requested an immediate blood count and, if needed, a transfusion to compensate for the blood Ms. McCall lost during the procedure. Forty minutes later, the family practice department physician ordered the blood count test. Forty minutes after that, and over an hour after Dr. Archibald had requested immediate blood work, a nurse attempted to draw blood from Ms. McCall. Ms. McCall was unresponsive. She had gone into shock and cardiac arrest as a result of severe blood loss. It is not clear how long Ms. McCall had been in this state, since no one had monitored her or checked her status for the hour following Dr. Archibald's procedure. Ms. McCall never regained consciousness and was removed from life support on February 27, 2006.

Id. at 946-47.

The Petitioners filed an action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80. Id. at 947. In addition

- 4 -

to finding the United States liable under the FTCA, the United States District Court for the Northern District of Florida determined that the Petitioners' economic damages, or financial losses, amounted to $980,462.40.  Id.  The district court concluded that the Petitioners' noneconomic damages, or nonfinancial losses, totaled $2 million, including $500,000 for Ms. McCall's son and $750,000 for each of her parents.  Id.

However, the district court limited the Petitioners' recovery of wrongful death noneconomic damages to $1 million upon application of section 766.118(2), Florida Statutes (2005), Florida's statutory cap on wrongful death noneconomic damages based on medical malpractice claims.  Id.[1]  The district court denied a motion filed by the Petitioners that challenged the constitutionality of Florida's wrongful death statutory cap under both the Florida and United States Constitutions.  Id.  The district court also denied the Petitioners' motion to alter or amend the judgment.  Id. at 947-48.

On appeal to the Eleventh Circuit, the Petitioners challenged the district court's rulings with regard to both the application and the constitutionality of the cap mandated by Florida law on wrongful death noneconomic damages for medical

---

1. Under the FTCA, damages are "determined by the law of the State where the tortious act was committed, 28 U.S.C. § 1346(b), . . . subject to the limitations that the United States shall not be liable for 'interest prior to judgment or for punitive damages.' " Hatahley v. United States, 351 U.S. 173, 182 (1956) (quoting 28 U.S.C. § 2674).

malpractice claims.  Id. at 948.  The Petitioners contended that the statutory cap violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and constitutes a taking in violation of the Fifth Amendment of the United States Constitution.  Id.  They also asserted that the cap violates the following provisions of the Florida Constitution: (1) the separation of powers guarantee in article II, section 3 and article V, section 1; (2) the right to trial by jury under article I, section 22; (3) the right of access to the courts under article I, section 21; (4) the right to equal protection under article I, section 2; and (5) the prohibition against the taking of private property without full compensation under article X, section 6.  Id.

The Eleventh Circuit affirmed the application of the statutory cap on noneconomic damages and held that the statute does not constitute a taking in violation of article X, section 6, of the Florida Constitution.  Id. at 953.  The federal appellate court also held that the cap does not violate either the Equal Protection Clause or the Takings Clause of the United States Constitution.  Id.  However, the Eleventh Circuit granted a motion filed by the Petitioners to certify four questions to this Court regarding the remaining challenges to the statutory cap under the Florida Constitution.  Id.

## STATUTORY PROVISION

At issue is Florida's statutory cap on wrongful death[2] noneconomic damages in medical negligence actions as articulated in section 766.118. Section 766.118(2) states:

> (2) Limitation on noneconomic damages for negligence of practitioners.—
> (a) With respect to a cause of action for personal injury or wrongful death arising from medical negligence of practitioners, regardless of the number of such practitioner defendants, noneconomic damages shall not exceed $500,000 per claimant. No practitioner shall be liable for more than $500,000 in noneconomic damages, regardless of the number of claimants.
> (b) Notwithstanding paragraph (a), if the negligence resulted in a permanent vegetative state or death, the total noneconomic damages recoverable from all practitioners, regardless of the number of claimants, under this paragraph shall not exceed $1 million. In cases that do not involve death or permanent vegetative state, the patient injured by medical negligence may recover noneconomic damages not to exceed $1 million if:
> 1. The trial court determines that a manifest injustice would occur unless increased noneconomic damages are awarded, based on a finding that because of the special circumstances of the case, the noneconomic harm sustained by the injured patient was particularly severe; and
> 2. The trier of fact determines that the defendant's negligence caused a catastrophic injury to the patient.
> (c) The total noneconomic damages recoverable by all claimants from all practitioner defendants under this subsection shall not exceed $1 million in the aggregate.

---

2. The legal analyses for personal injury damages and wrongful death damages are not the same. The present case is exclusively related to wrongful death, and our analysis is limited accordingly.

§ 766.118(2), Fla. Stat.[3] Noneconomic damages refer to "nonfinancial losses . . .

including pain and suffering, inconvenience, physical impairment, mental anguish .

. . loss of capacity for enjoyment of life, and other nonfinancial losses to the extent

the claimant is entitled to recover such damages under general law, including the

Wrongful Death Act." § 766.202(8), Fla. Stat. (2005) (incorporated in §

766.118(1)(b), Fla. Stat. (2005)).

## EQUAL PROTECTION

We have rephrased the first question certified to this Court by the Eleventh

Circuit which addresses whether the cap on wrongful death noneconomic damages

under section 766.118 violates the right to equal protection guaranteed by the

Florida Constitution. The Florida Constitution provides, in pertinent part:

All natural persons, female and male alike, are equal before the law.

Art. I, § 2, Fla. Const. This Court has stated "[t]he constitutional right of equal

protection of the laws means that everyone is entitled to stand before the law on

---

3. Section 766.118 separates the cap on noneconomic damages into two categories, providing different limitations on damages for practitioners and nonpractitioners. See § 766.118(2), (3), Fla. Stat. Section 766.118(3), Florida Statutes, limits noneconomic damages for the negligence of nonpractitioner defendants. The Petitioners asserted that they were entitled to recover under this subsection as well; however, the federal district court noted that "no evidence at trial singled out a specific nonpractitioner for negligent conduct." McCall, 642 F.3d at 948-49 (quoting Estate of McCall v. United States, 663 F. Supp. 2d 1276, 1295 (N.D. Fla. 2009)). The federal district court concluded that the Petitioners had failed to establish that Ms. McCall's death resulted from the negligence of a nonpractitioner, and the Eleventh Circuit affirmed this determination. Id. at 949.

equal terms with, to enjoy the same rights as belong to, and to bear the same burden as are imposed upon others in a like situation." Caldwell v. Mann, 26 So. 2d 788, 790 (Fla. 1946).

Unless a suspect class or fundamental right protected by the Florida Constitution is implicated by the challenged provision, the rational basis test will apply to evaluate an equal protection challenge. See Amerisure Ins. Co. v. State Farm Mut. Auto. Ins. Co., 897 So. 2d 1287, 1291 n.2 (Fla. 2005). To satisfy the rational basis test, a statute must bear a rational and reasonable relationship to a legitimate state objective, and it cannot be arbitrary or capriciously imposed. Dep't of Corr. v. Fla. Nurses Ass'n, 508 So. 2d 317, 319 (Fla. 1987). Stated another way, the test for consideration of equal protection is whether individuals have been classified separately based on a difference which has a reasonable relationship to the applicable statute, and the classification can never be made arbitrarily without a reasonable and rational basis.

Having carefully considered the arguments of both parties and the amici, we conclude that section 766.118 violates the Equal Protection Clause of the Florida Constitution under the rational basis test. The statutory cap on wrongful death noneconomic damages fails because it imposes unfair and illogical burdens on injured parties when an act of medical negligence gives rise to multiple claimants. In such circumstances, medical malpractice claimants do not receive the same

rights to full compensation because of arbitrarily diminished compensation for legally cognizable claims. Further, the statutory cap on wrongful death noneconomic damages does not bear a rational relationship to the stated purpose that the cap is purported to address, the alleged medical malpractice insurance crisis in Florida.

**Arbitrary Distinctions**

This Court previously reasoned in St. Mary's Hospital, Inc. v. Phillipe, 769 So. 2d 961 (Fla. 2000), that the type of classification addressed in this case is purely arbitrary and unrelated to a true state interest. We clearly announced in Phillipe that aggregate caps or limitations on noneconomic damages violate equal protection guarantees under the Florida Constitution when applied without regard to the number of claimants entitled to recovery. This inherently discriminatory action and resulting invidious discrimination do not pass constitutional muster. We stated:

> If we were to accept St. Mary's contention that the Legislature intended to limit noneconomic damages to $250,000 per incident in the aggregate, then the death of a wife who leaves only a surviving spouse to claim the $250,000 is not equal to the death of a wife who leaves a surviving spouse and four minor children, resulting in five claimants to divide $250,000. We fail to see how this classification bears any rational relationship to the Legislature's stated goal of alleviating the financial crisis in the medical liability industry. Such a categorization offends the fundamental notion of equal justice under the law and can only be described as purely arbitrary and unrelated to any state interest.

- 10 -

Id. at 972 (emphasis supplied).

The equal protection violation identified by Phillipe is evident in the present case. The plain language of this statutory plan irrationally impacts circumstances which have multiple claimants/survivors differently and far less favorably than circumstances in which there is a single claimant/survivor and also exacts an irrational and unreasonable cost and impact when, as here, the victim of medical negligence has a large family, all of whom have been adversely impacted and affected by the death. Three separate noneconomic damage determinations were assessed by the federal district court based on the evidence presented. The damages suffered by Ms. McCall's parents were determined to be $750,000 each, and Ms. McCall's surviving son sustained damages determined to be $500,000. Applying the cap, the federal court then reduced the amounts of damages so each claimant would receive only half of his or her respective damages. Yet, if Ms. McCall had been survived only by her son, he would have recovered the full amount of his noneconomic damages: $500,000. Here, the cap delineated in section 766.118 limited the recovery of a surviving child (and surviving parents) simply because others also suffered losses. In a larger context, under section 766.118, the greater the number of survivors and the more devastating their losses are, the less likely they are to be fully compensated for those losses.

Other state supreme courts have struck down caps on noneconomic damages

based upon a similar rationale. In holding that a $500,000 cap per plaintiff on noneconomic damages in negligence and product liability actions violated the state constitution,[4] the Supreme Court of Illinois aptly described how the cap operated to discriminate against claimants who have suffered the most grievous injuries, while benefitting the tortfeasor and/or the insurance company:

> In the first example . . . three plaintiffs are injured as a result of the same tortfeasor's negligence. Plaintiff A is injured moderately, and suffers pain, disability and disfigurement for a month. Plaintiff B is severely injured and suffers one year of pain and disability. Plaintiff C is drastically injured, and suffers permanent pain and disability. . . . [I]t is further assumed that a jury awards plaintiffs A and B $100,000 in compensatory damages for noneconomic injuries. Plaintiff C receives $1 million for his permanent, lifelong pain and disability.
> . . . With respect to plaintiff C, [the challenged legislation] <u>arbitrarily and automatically reduces the jury's award for a lifetime of pain and disability, without regard to whether or not the verdict, before reduction, was reasonable and fair.</u>
> The tortfeasors in this example are also treated differently, without any justification. The tortfeasor who injures plaintiffs A and B is liable for the full amount of fairly assessed compensatory damages. In contrast, [the challenged legislation] <u>confers a benefit on the similarly situated tortfeasor who injures plaintiff C.</u> This tortfeasor pays only a portion of fairly assessed compensatory damages because of the limitation [on noneconomic damages].

---

4. The Supreme Court of Illinois concluded that the cap violated the special legislation clause of the Illinois Constitution. Best v. Taylor Mach. Works, 689 N.E.2d 1057, 1078 (Ill. 1997). This clause "expressly prohibits the General Assembly from conferring a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated." Id. at 1069. The Supreme Court of Illinois noted that special legislation constitutional challenges are generally "judged under the same standards applicable to an equal protection challenge." Id. at 1070-71.

> Therefore, the statute discriminates between slightly and severely injured plaintiffs, and also between tortfeasors who cause severe and moderate or minor injuries.

Best v. Taylor Mach. Works, 689 N.E.2d 1057, 1075 (Ill. 1997) (emphasis supplied). The Supreme Court of New Hampshire condemned on equal protection grounds a $250,000 cap on noneconomic damages in medical malpractice cases, concluding that it is "simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation." Carson v. Maurer, 424 A.2d 825, 837 (N.H. 1980), overruled on other grounds, Cmty. Res. for Justice, Inc. v. City of Manchester, 917 A.2d 707, 721 (N.H. 2007).

Section 766.118, Florida Statutes, has the effect of saving a modest amount for many by imposing devastating costs on a few—those who are most grievously injured, those who sustain the greatest damage and loss, and multiple claimants for whom judicially determined noneconomic damages are subject to division and reduction simply based upon the existence of the cap. Under the Equal Protection Clause of the Florida Constitution, and guided by our decision in Phillipe, we hold that to reduce damages in this fashion is not only arbitrary, but irrational, and we conclude that it "offends the fundamental notion of equal justice under the law." Phillipe, 769 So. 2d at 972; see also id. at 971 ("Differentiating between a single claimant and multiple claimants bears no rational relationship to the Legislature's

- 13 -

stated goal of alleviating the financial crisis in the medical liability insurance industry.").

Our holding today is not inconsistent with the decisions in <u>Samples v. Florida Birth-Related Neurological Injury Compensation Ass'n</u>, 114 So. 3d 912 (Fla. 2013), <u>Mizrahi v. North Miami Medical Center</u>, 761 So. 2d 1040 (Fla. 2000), or <u>University of Miami v. Echarte</u>, 618 So. 2d 189 (Fla. 1993), because a review of those cases reveals that they involved statutes or challenges which are distinguishable from the present challenge to section 766.118. In <u>Samples</u>, the statute at issue created funding and authorized a $100,000 award to parents under the Florida Birth-Related Neurological Injury Compensation Plan (the Plan), which was structured with other benefits and provided compensation without regard to fault for birth-related neurological injury claims. 114 So. 3d at 914-15; <u>see also</u> § 766.303, Fla. Stat. (2013). In rejecting an equal protection challenge on the basis that the statute treats a parent who files for the $100,000 award alone differently than parents who share or divide the award, this Court distinguished the decision in <u>Phillipe</u>, upon which we rely today:

> Whereas the provision of the Medical Malpractice Act at issue in [<u>Phillipe</u>] expressly concerns fault-based noneconomic damages for survivors of the deceased, the Plan at issue here establishes a system of no-fault compensation. The no-fault character of the Plan sets the parental award provision apart from the statutory limitation on fault-based damages at issue in [<u>Phillipe</u>]. Limitations on damages that raise equal protection concerns under a fault-based system are dissimilar and appropriately viewed differently than limitations on

- 14 -

> compensation under a system where eligible claimants are assured of a recovery without regard to fault.

114 So. 3d at 919. Here, as in Phillipe, section 766.118 concerns the award of damages in a traditional fault-based action. Further, section 766.118 arbitrarily reduces damages without regard to the fault of a tortfeasor simply based upon the number of survivors who are entitled to recovery. This is clearly distinguishable from the no-fault compensation award under the Plan at issue in Samples. The Plan was created by the Florida Legislature with the express purpose of "providing compensation, irrespective of fault, for birth-related neurological injury claims." § 766.303(1), Fla. Stat. (2013) (emphasis supplied). We reiterate that the present case does not involve a statutorily-created no-fault compensation plan. Thus, the two statutory schemes are, quite simply, completely different and distinct. Accordingly, Samples is distinguishable from the present case and, contrary to the assertion of the dissent, does not control, or even inform, the outcome here.

Mizrahi involved a statute that precluded adult children of wrongful death victims from recovering noneconomic damages where the cause of death was medical malpractice. 761 So. 2d at 1041. In rejecting an equal protection challenge, we noted that under the common law an adult who was not dependant on a parent had no action and could not recover damages for injuries to that parent. Id. at 1042 (quoting Stewart v. Price, 718 So. 2d 205, 209 (Fla. 1st DCA 1998)). When the Legislature created the right for adult children to recover damages for

the injuries and wrongful death of a parent, it chose to exclude those children from recovering noneconomic damages in one type of action (medical malpractice). Id. We ultimately held that the statute, "which created a right of action for many while excluding a specific class from such action, and which exclusion is rationally related to controlling healthcare costs and accessibility," did not violate equal protection. Id. at 1043.

Unlike Mizrahi, the statute under review here does not address and expand a class of individuals eligible to recover noneconomic wrongful death damages. Instead, it treats similarly situated, eligible survivors differently by reducing the damages awarded without regard to the fault of the wrongdoer and based solely upon a completely arbitrary factor, i.e., how many survivors are entitled to recovery. The greater the number of survivors who are eligible to recover noneconomic damages in a medical malpractice wrongful death action, the lesser the award that each individual survivor will receive. Thus, the statute at issue in Mizrahi is also distinguishable from the noneconomic damages caps in section 766.118.

Finally, in Echarte this Court considered whether a $250,000 cap on noneconomic damages for medical malpractice claims where a party requested arbitration violated the access to courts provision of the Florida Constitution. 618 So. 2d at 190, 193. In the present case, because we address only an equal

- 16 -

protection challenge—not an access to courts challenge—<u>Echarte</u> is inapposite. Nevertheless, the holding in <u>Echarte</u> that the cap was constitutional does not impact our decision today. In upholding the constitutionality of the cap in medical malpractice arbitration proceedings, this Court in <u>Echarte</u> noted that arbitration provided commensurate benefits in exchange for the cap, such as saving the expense of attorney fees and expert witnesses. <u>Id.</u> at 194. Conversely, under section 766.118, survivors receive absolutely no benefit whatsoever from the cap on noneconomic damages, but only arbitrary reductions based upon the number of survivors.

Moreover, the statute imposing the cap in <u>Echarte</u> was later addressed by this Court in <u>Phillipe</u>. In <u>Phillipe</u>, we held that the cap applied <u>per claimant</u> rather than <u>per incident</u>, and noted that to hold otherwise would create equal protection concerns. 769 So. 2d at 971. In reaching this conclusion, we expressly stated that "<u>Echarte</u> does not control our decision." <u>Id.</u> Similarly, <u>Echarte</u> does not compel a different result here. Rather, <u>Phillipe</u>, which recognized that <u>Echarte</u> did not address a circumstance in which similarly situated survivors would receive different, arbitrarily reduced noneconomic damage awards solely based upon the number of survivors, is the decision which guides our analysis as to the constitutionality of section 766.118. <u>See Phillipe</u>, 769 So. 2d at 971 (noting that

"the loss of a survivor is not diminished by the mere fact that there are multiple survivors").

Despite our discussion of Phillipe, we emphasize that, contrary to the assertion in the concurring in result opinion, our examination of the validity of section 766.118 cannot simply conclude without further analysis. The statute at issue in Phillipe, related to damage limits, is not identical to the factors in the present case. Phillipe involved a very different statutory scheme, based upon noneconomic damage awards in the arbitration context, a factual scenario not presented here. Therefore, while Phillipe provides guidance and may be considered persuasive, it is not dispositive of our equal protection analysis today. We cannot take the drastic step of invalidating a statute simply by declaring it so and relying upon an unrelated case which evaluated an unrelated statute. Instead, a comprehensive equal protection analysis of the cap on damages in section 766.118 is required under Florida law to resolve the certified question. Accordingly, a description of the elements of an equal protection review, and our evaluation of those elements, must follow. This is a consideration of the facts and circumstances surrounding the challenged statute and the subject matter it addresses.

**The Alleged Medical Malpractice Crisis**

In addition to arbitrary and invidious discrimination between medical malpractice claimants, the cap on noneconomic damages also violates the Equal

Protection Clause of the Florida Constitution because it bears no rational relationship to a legitimate state objective, thereby failing the rational basis test. See Fla. Nurses Ass'n, 508 So. 2d at 319. Although the concurring in result opinion seeks to avoid a full proper legal analysis, contrary to the view of that opinion, no single prior case provides a complete answer and none provides any legal analysis which affords a basis for an answer to the question we must address. Our precedent expressly states that a proper equal protection analysis under the rational basis test "requires this Court to determine: (1) whether the challenged statute serves a legitimate governmental purpose, and (2) whether it was reasonable for the Legislature to believe that the challenged classification would promote that purpose." Warren v. State Farm Mut. Auto. Ins. Co., 899 So. 2d 1090, 1095 (Fla. 2005) (emphasis supplied); see also Zapo v. Gilreath, 779 So. 2d 651, 655 (Fla. 5th DCA 2001); Fla. Dept. of Ins. v. Keys Title & Abstract Co., 741 So. 2d 599, 602 (Fla. 1st DCA 1999). Thus, under Warren, and contrary to the view of the concurring in result opinion, both prongs of the rational basis test must be evaluated to determine the constitutionality of a statute.

Despite this precedent, the concurring in result opinion loudly proclaims that the full rational basis test be ignored and the legitimacy of the purpose for the cap not be addressed as part of our constitutional analysis. Further, that concurring in result opinion argues that only a single decision which does not set forth a proper

- 19 -

analysis be applied.  However, we would abandon our obligation under <u>Warren</u> were we to simply rubber stamp the Legislature's asserted justification for the cap—as the concurring in result and dissenting opinions suggest we do—and fail to consider the existing factors and circumstances to determine whether there is legitimacy to that justification.  We decline to abdicate our responsibility under the law and, therefore, address whether the cap "serves a <u>legitimate</u> governmental purpose" pursuant to the first prong of <u>Warren</u>.  899 So. 2d at 1095 (emphasis supplied).

The Florida Legislature attempted to justify the cap on noneconomic damages by claiming that "Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude."  Ch. 2003-416, § 1, Laws of Fla., at 4035.  The Legislature asserted that the increase in medical malpractice liability insurance premiums has resulted in physicians leaving Florida, retiring early from the practice of medicine, or refusing to perform high-risk procedures, thereby limiting the availability of health care.  <u>Id.</u>

In enacting the statutory cap on noneconomic damages, the Legislature relied heavily on a report prepared by the Governor's Select Task Force on Healthcare Professional Liability Insurance (Task Force), which concluded that "actual and potential jury awards of noneconomic damages (such as pain and suffering) are a key factor (perhaps the most important factor) behind the

unavailability and un-affordability of medical malpractice insurance in Florida."

Report of Governor's Select Task Force on Healthcare Professional Liability

Insurance (Task Force Report) (Jan. 29, 2003), at xvii.

To evaluate the constitutionality of the cap on noneconomic damages

imposed by section 766.118, we are not required to accept the findings of the

Legislature or the Task Force at face value.  Instead:

> While courts may defer to legislative statements of policy and fact, courts may do so only when those statements are based on actual findings of fact, and <u>even then courts must conduct their own inquiry</u>:

>> The general rule is that findings of fact made by the legislature are presumptively correct.  However, it is well-recognized that the findings of fact made by the legislature must actually be findings of <u>fact</u>.  They are not entitled to the presumption of correctness if they are nothing more than recitations amounting only to conclusions and <u>they are always subject to judicial inquiry</u>.

N. Fla. Women's Health & Counseling Serv., Inc. v. State, 866 So. 2d 612, 627

(Fla. 2003) (quoting Moore v. Thompson, 126 So. 2d 543, 549 (Fla. 1960)) (some

emphasis supplied).

Our consideration of the factors and circumstances involved demonstrates

that the conclusions reached by the Florida Legislature as to the existence of a

medical malpractice crisis are not fully supported by available data.  Instead, the

alleged interest of health care being unavailable is completely undermined by

authoritative government reports.  Those government reports have indicated that

the numbers of physicians in both metropolitan and non-metropolitan areas have increased. For example, in a 2003 report, the United States General Accounting Office found that from 1991 to 2001, Florida's physician supply per 100,000 people grew from 214 to 237 in metropolitan areas and from 98 to 117 in nonmetropolitan areas, or percentage increases of 10.7 and 19, respectively. Physician Workforce: Physician Supply Increased in Metropolitan and Nonmetropolitan Areas but Geographic Disparities Persisted, No. GAO-04-124, (Oct. 31, 2003), at 23, available at http://www.gao.gov/new.items/d04124.pdf. Thus, during this purported crisis, the numbers of physicians in Florida were actually increasing, not decreasing.

Additionally, an analysis of claim activity certainly does not provide a rational basis for the clear discrimination presented by the legislation. Although assertions of a malpractice insurance crisis are often accompanied by images of runaway juries entering verdicts in exorbitant amounts of noneconomic damages, see, e.g., Task Force Report at xvii, one study revealed that in Florida cases which resulted in payments of $1 million or more over a fourteen-year period, only 7.5 percent involved a jury trial verdict. See Neil Vidmar, Kara MacKillop & Paul Lee, Million Dollar Medical Malpractice Cases in Florida: Post-Verdict and Pre-

Suit Settlements, 59 Vand. L. Rev. 1343, 1345-46 (2006).[5] Moreover, 10.1 percent of settlements that involved payments of $1 million or more were resolved without a legal action ever being filed. Id. at 1360. Such statistics led the authors of the study to conclude that jury trials constitute only a very small portion of medical malpractice payments. Id. at 1345. The authors also concluded that "tort reform efforts focused on jury verdicts are misdirected, at least with respect to $1 million verdicts in Florida. Not only do jury trials constitute only a small portion of $1 million payments, [but] the settlements following verdicts tend to be substantially less than the jury awards." Id. at 1381 (emphasis supplied).[6] Thus, available data indicates the Task Force's finding that noneconomic damage awards by juries are a primary cause of the purported medical malpractice crisis in Florida is most questionable.

Even the Task Force whose report was relied upon by the Florida Legislature employed extremely equivocal language and speculation when

---

5. Further, a national study reflects that from 1991 until 2003, judgments at trial accounted for only 4 percent of all malpractice payments. Amitabh Chandra, Shantanu Nundy, & Seth A. Seabury, The Growth Of Physician Medical Malpractice Payments: Evidence From The National Practitioner Data Bank, Health Affairs at W5-240, W5-243 (May 31, 2005), available at http://content.healthaffairs.org/content/early/2005/05/31/hlthaff.w5.240.full.pdf+html.

6. According to the authors, with one exception, cases with verdicts in excess of $4 million settled for, on average, 37 percent less than the verdict. Million Dollar Medical Malpractice Cases in Florida, 59 Vand. L. Rev. at 1380.

describing the existence of a crisis.  For example, the Task Force stated that it "believes" the alleged crisis "<u>could</u> get worse in the coming years. . . .  Medical malpractice insurance premiums <u>may become</u> unaffordable, and/or coverage <u>may become</u> unavailable at any price to many physicians and hospitals."  <u>See</u> Task Force Report, at 211-12 (emphasis supplied).  Further, despite blaming "actual and potential jury awards of noneconomic damages" for this ominous prediction, Task Force Report at xvii, the Task Force recognized that there are other explanations for the dramatic rise in medical malpractice insurance premiums.  For example, the Task Force Report notes that in the opinion of Joanne Doroshow, Executive Director of the Center for Justice and Democracy:

> [T]his so-called "crisis" is nothing more than the underwriting cycle of the insurance industry, and driven by the same factors that caused the "crises" in the 1970s and 1980s.  According to . . . Doroshow, with each crisis, there has been a severe drop in the investment income for insurers, which has been compounded by sever [sic] under-pricing of insurance premiums in the prior years. . . .  [D]uring years of high interest rates or excellent insurer profits that are invested for maximum return, the insurance companies engage in fierce competition for premium dollars by selling under-priced premiums and insuring very poor risks.  Then . . . when investment income drops, either due to increases in interest rates or the stock market, or due to low income resulting from unbearably low premiums, the insurance industry responds by sharply increasing premiums and reducing coverage.
>     . . . The tort reform changes in the 1980s had nothing to do with the flattening of rates.  The flattening was caused instead by modulations in the insurance cycle throughout the country.

Task Force Report, at 64 (footnotes omitted).  The Task Force itself

acknowledged:

> Medical malpractice insurance has been subject to sudden jolts, both in availability of coverage and cost. An entire cycle has been defined as the period of years in which insurer underwriting profits cycle from above average to below average. <u>These cycles have always occurred in the insurance industry, particularly in medical malpractice insurance</u>.

Task Force Report, at 31 (emphasis supplied) (footnotes omitted). <u>See also</u> Tom Baker, THE MEDICAL MALPRACTICE MYTH 53-54 (2005) ("[T]he two most recent medical liability insurance crises did not result from sudden or dramatic increases in medical malpractice settlements or jury verdicts. . . . [T]he crises resulted from dramatic increases in the amount of money that the insurance industry put in reserve for claims. Those reserve increases were so big because the insurance industry systematically underreserved in the years leading up to the crisis.").

Finally, testimony before the Senate Judiciary Committee and debate within the Florida Senate raised questions concerning the magnitude of any purported health care crisis. With regard to the former, the deputy director of the Florida Office of Insurance Regulation testified he had found <u>no</u> evidence to suggest that there had been a large increase in the number of frivolous lawsuits filed in Florida, nor was there any evidence of excessive jury verdicts in the prior three years. Testimony of Steve Roddenberry, Senate Judiciary Committee Meeting, July 14, 2003, at 3, 10.

During the subsequent floor debate, the following dialogue occurred

between a senator and the Chairman of the Senate Judiciary Committee:

> SENATOR: Were you able to determine whether or not there is an access to health care crisis in terms of the number of doctors licensed to practice medicine, the number of hospital closures or the number of emergency rooms closed?
>
> . . . .
>
> CHAIRMAN: [T]his is not what I found. What the testimony was from both the Department of Health, the Agency for Health Care Administration and various other people . . . was that <u>there, in fact, are more doctors licensed to practice today in the State of Florida than there were five years ago</u>.
>
> Applications to the medical schools in the State of Florida are up and have been up consistently for the past, for the past number of years.
>
> And also that emergency rooms have not been closing as a result of medical malpractice.
>
> As a matter of fact, the Department of Health and the Agency for Health Care Administration both testified under oath that <u>they could not cite any incidents where because of a medical malpractice crisis patients were denied some type of care or directed someplace else</u>.

Senate Floor Debate Tr. 22-23 (Aug. 13, 2003) (emphasis supplied). Further

support for the testimony of the committee chairman exists in a report prepared by

the United States General Accounting Office, which states:

> Reports of physician departures in Florida were anecdotal, not extensive, and in some cases we determined them to be inaccurate. For example, state medical society officials told us that Collier and Lee counties lost all of their neurosurgeons due to malpractice concerns; however, we found at least five neurosurgeons currently practicing in each county as of April 2003. Provider groups also reported that malpractice pressures have recently made it difficult for Florida to recruit or retain physicians of any type; however, over the past 2 years the number of new medical licenses issued has increased and physicians per capita has remained unchanged.

- 26 -

Medical Malpractice: Implications of Rising Premiums on Access to Health Care,

No. GAO-03-836, (Aug. 2003), at 17-18, available at

http://www.gao.gov/new.items/d03836.pdf.

Moreover, for those doctors who are leaving or have left Florida, there was

no concrete evidence to demonstrate that high malpractice premiums were the

cause of that departure.  During her testimony before the Senate Judiciary

Committee, the CEO of the Florida Medical Association testified with regard to

two cases where physicians had relocated from Florida to North Carolina and New

York, after which the following testimony ensued:

> SENATOR:  The [American Medical Association] has identified the states with national [crises], medical malpractice.  One of the states is North Carolina.  One of the states is New York.  So it seems like you get some physicians that are leaving Florida for states that are also considered by the AMA to be in national crisis.  Why?
> CEO:  Maybe they haven't figured that out yet.
> CHAIRMAN:  You better call the guy from North Carolina and—
> CEO:  I haven't got the answer to that.  I haven't talked to any of these people individually.
> CHAIRMAN:  You better call the guy from North Carolina and tell him they don't have caps there either.

Testimony of Sandra Mortham, Senate Judiciary Committee Meeting, July 14,

2003, at 117, 129-30.

Based upon these statements and reports, although medical malpractice

premiums in Florida were undoubtably high in 2003, we conclude the Legislature's

determination that "the increase in medical malpractice liability insurance rates is

forcing physicians to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk procedures, or to retire early from the practice of medicine" is unsupported. Ch. 2003-416, §1, Laws of Fla., at 4035. Thus, the finding by the Legislature and the Task Force that Florida was in the midst of a bona fide medical malpractice crisis, threatening the access of Floridians to health care, is dubious and questionable at the very best.

**The Impact of Damage Caps on the Alleged Crisis**

Even if these conclusions by the Legislature are assumed to be true, and Florida was facing a dangerous risk of physician shortage due to malpractice premiums, we conclude that section 766.118 still violates Florida's Equal Protection Clause because the available evidence fails to establish a rational relationship between a cap on noneconomic damages and alleviation of the purported crisis. See generally Fla. Nurses Ass'n, 508 So. 2d at 319 (stating that for legislation to be constitutional under the rational basis standard, it must bear a rational and reasonable relationship to a legitimate state objective).

Reports have failed to establish a direct correlation between damages caps and reduced malpractice premiums. Weiss Ratings, which evaluates the performance of the malpractice insurance industry, has detailed two particularly salient findings. First, based upon data acquired from 1991 until 2002, the median medical malpractice premiums paid by physicians in three high-risk

specialties—internal medicine, general surgery, and obstetrics/gynecology—rose by 48.2 percent in states that have damages caps, but in states <u>without</u> caps, the median annual premium increased at a <u>slower</u> rate—by 35.9 percent. Martin D. Weiss, Melissa Gannon & Stephanie Eakins, <u>Medical Malpractice Caps: The Impact of Non-Economic Damage Caps on Physician Premiums, Claims Payout Levels, and Availability of Coverage</u>, at 7-8 (rev. ed. June 3, 2003), available at http://www.weissratings.com/pdf/malpractice.pdf. Second, the study noted that among states <u>with</u> caps on damages, only 10.5 percent (two of nineteen states with caps) experienced static or declining medical malpractice premium rates following the imposition of caps. In contrast, among states <u>without</u> damages caps, 18.7 percent (six of thirty-two states[7] without caps) experienced static or declining medical malpractice premiums. <u>Id.</u> at 8.

Additionally, Robert White, the President of First Professionals Insurance Company (FPIC), testified during a Senate Judiciary Committee meeting that a $500,000 cap on noneconomic damages would achieve "virtually nothing" with regard to stabilizing medical malpractice insurance rates. Testimony of Robert White, Senate Judiciary Committee Meeting, July 14, 2003, at 48, 50-51. Earlier in 2003, Mr. White informed a group of Palm Beach physicians: "No responsible

---

7. The study states that "the District of Columbia is being referred to as a 'state' since it effectively operates as such with regard to insurance regulation." <u>Medical Malpractice Caps</u>, at 7 n.4.

insurer can cut its rates after a bill [that caps noneconomic damages at $250,000] passes."  Phil Galewitz, "Underwriter Gives Doctors Dose of Reality," Palm Beach Post, Jan. 29, 2003, at 1A.  Mr. White advised that "[e]ven if a cap is approved by the legislature and survives the likely legal challenge . . . it would yield on average only a 16 percent premium cut."  Id. (emphasis supplied).  Interestingly, during his testimony before the Senate Judiciary Committee, Mr. White acknowledged that in 2002, the experience of FPIC was more positive in Florida than in Missouri, a state which at that time had implemented caps on damages.  Testimony of Robert White, Senate Judiciary Committee Meeting, at 59.

Members of the Florida Senate and the House of Representatives also expressed doubt as to whether a noneconomic damages cap would have the effect of reducing premiums.  During floor debate in the Senate, the following dialogue between a senator and the Chairman of the Senate Judiciary Committee occurred:

> SENATOR:  [W]as there any testimony from either FPIC or any other insurance company that may have testified . . . that they would immediately reduce rates if they got a cap on damages?
> SENATE PRESIDENT: [Chairman] to respond.
> CHAIRMAN:  No.
> . . . .
> SENATOR:  Was there any testimony the only way that you could reduce malpractice premiums was to cap damages?
> SENATE PRESIDENT:  [Chairman to respond.]
> CHAIRMAN:  No.
> . . . .
> SENATOR:  . . . It's my recollection, and maybe this might help [the Chairman], I remember a Mr. Bob White, representing FPIC, in testimony relative to the caps said, no, there wouldn't be an

immediate reduction in medical malpractice premiums due to caps, but as soon as they would be affirmed by a Court, there would be an immediate reduction available.

. . . .

CHAIRMAN: Senator . . . that was not the testimony given by Mr. White. I believe he said that bad faith and a series of other things had to be there, so the answer is no, it was not by placing a $250,000 cap that would give a reduction.

. . . .

[T]he question was very specific, whether or not caps, whether or not Mr. White said that caps would reduce insurance rates. That was the question.

The answer is, he said no. I have the transcripts on my desk, and if you would care to show me where it says otherwise, I would be happy to say so.

. . . .

What he did say was you have to add several variables, bad faith is one of them and I believe there were others. So if the question is on caps, the answer is no.

Senate Floor Debate Tr. 45-47, 49 (Aug. 13, 2003). Further, during floor debate in the House of Representatives, one representative expressed concern that if the Florida Legislature implements a cap on noneconomic damages, there is no requirement in the bill that insurers pass any savings onto physicians. House Floor Debate Tr. 38-39 (Aug. 13, 2003) ("[A]t the end of the day, actually, [the insurance companies] don't have to pay anything back to the doctors. It's just a windfall, and there's no provision in the bill that says otherwise.").

The concerns of that representative were very perceptive and were not unfounded. While the cap on noneconomic damages limits the amount of money that insurance companies must pay injured victims of medical malpractice, section

766.118 does not require insurance companies to use the acquired savings to lower malpractice insurance premiums for physicians, and the argument and reliance by the Respondent on rate reduction statutes is misplaced. When the statutory cap on noneconomic damages was first enacted, the legislation contained a provision, codified at section 627.062(8)(a)1., Florida Statutes (2003), that simply required the Florida Office of Insurance Regulation (FLOIR) to calculate a "presumed factor that reflects the impact that the changes contained in such legislation will have on rates for medical malpractice insurance and shall issue a notice informing all insurers writing medical malpractice coverage of such presumed factor." Ch. 2003-416 § 40, Laws of Fla, at 4078. There was no mandated rate reduction. After FLOIR issued a notice of the presumed factor, all medical malpractice insurance companies that offered coverage in Florida were directed to submit a rate filing for medical malpractice insurance that reflected "an overall rate reduction at least as great as the presumed factor." § 627.062(8)(a)2., Fla. Stat. (2003).

Although at first glance this statutory subsection may appear to compel medical malpractice insurance companies to reduce their rates in response to the 2003 legislation, FLOIR nonetheless advised that "[e]ven after application of the presumed factor, we anticipate insurers will file for rate increases." Press Release, Florida Office of Insurance Regulation, Office of Insurance Regulation Releases Presumed Factor (Nov. 10, 2003), available at

http://www.floir.com/PressReleases/viewmediarelease.aspx?id=1316.  Moreover,

despite any intended moderation of medical malpractice premiums based upon the

calculation of the presumed factor, the 2013 Annual Report on Medical

Malpractice Financial Information, Closed Claim Database and Rate Filings,

prepared by FLOIR compared the premiums of Florida doctors in four specialties

(family practice, obstetrics, emergency, and orthopedics) with other sampled states

and concluded that "Florida is either the highest (of nine states) or the second

highest state as far as premiums go in all but one of the scenarios."  2013 FLOIR

Annual Report (Oct. 1, 2013) at 57-58, available at

http://www.floir.com/Office/DataReports.aspx#rec (CY2012).  Therefore, despite

assertions that the presumed factor created in section 627.062(8)(a) caused massive

rate reductions by medical malpractice insurers to pass savings onto their

customers, the data suggests otherwise.  Subdivision (8) was even repealed from

section 627.062 in 2011, having been designated "obsolete" by the Legislature.

Ch. 2011-39, § 12, Laws of Fla., at 514, 536-37.

A number of state courts have expressed concern that without a statutory

mandate that insurance companies lower their insurance premiums in response to

tort reform, the savings resulting from reforms such as damages caps may simply

increase insurance company profits.  In Zeier v. Zimmer, Inc., 152 P.3d 861 (Okla.

2006), the Oklahoma Supreme Court held that a statute requiring a medical

malpractice claimant to obtain an affidavit of merit from a qualified expert as a prerequisite to filing an action was unconstitutional under the Oklahoma Constitution.  See id. at 874.  While Zeier did not address caps, we find an observation of the Oklahoma Supreme Court to be just as applicable to caps on noneconomic damages:

> [An] unanticipated result of statutes similar to Oklahoma's scheme has been the creation of a windfall for insurance companies . . . which are not required to implement post-tort reform rates decreasing the cost of medical malpractice insurance to physicians.  These companies happily pay less out in tort-reform states while continuing to collect higher premiums from doctors.

Id. at 869-70 (footnote omitted).

Moreover, the Texas Supreme Court has strongly questioned whether caps on damages will lower insurance premiums.  In Lucas v. United States, 757 S.W.2d 687 (Tex. 1988), the court noted that when the Texas Legislature enacted medical malpractice damages caps, it stated that "adoption of certain modifications in the medical, insurance, and legal systems . . . may or may not have an effect on the rates charged by insurers for medical professional liability coverage."  Id. at 691.  In striking down the caps as unconstitutional, the court concluded that "[i]n the context of persons catastrophically injured by medical negligence, we believe it is unreasonable and arbitrary to limit their recovery in a speculative experiment to determine whether liability insurance rates will decrease."  Id.  We completely agree with and adopt the position of the Supreme Court of Texas.

- 34 -

We conclude that the record and available data fail to establish a legitimate relationship between the cap on wrongful death noneconomic damages and the lowering of medical malpractice insurance premiums. Accordingly, we hold that section 766.118 fails the rational basis test and violates the Equal Protection Clause of the Florida Constitution. See generally Fla. Nurses Ass'n, 508 So. 2d at 319.

**The Current Status of Medical Malpractice in Florida**

Lastly, even if a "crisis" existed when section 766.118 was enacted, a crisis is not a permanent condition. Conditions can change, which remove or negate the justification for a law, transforming what may have once been reasonable into arbitrary and irrational legislation. The United States Supreme Court has recognized that "[a] law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." Chastleton Corp. v. Sinclair, 264 U.S. 543, 547-48 (1924). See also Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund, 701 N.W.2d 440, 468 (Wisc. 2005) ("A statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies. A past crisis does not forever render a law valid." (footnotes omitted)). Thus, even if section 766.118 may have been rational when it was enacted based on information that was available at the time, it will no longer be rational where the factual premise

upon which the statute was based has changed. It is for this reason that Florida courts consider both pre- and post-enactment data in assessing the continued rationality of a statute.

Having evaluated current data, we conclude that no rational basis exists to justify continued application of the noneconomic damages cap of section 766.118. The 2011 State Physician Workforce Data Book prepared by the Association of American Medical Colleges (AAMC) reflects that in 2010, there were 254.8 active physicians for every 100,000 people in Florida, a number higher than twenty-eight other states. AAMC, 2011 State Physician Workforce Data Book, at 9 (Nov. 2011), available at https://www.aamc.org/download/263512/data/statedata2011.pdf. Further, data collected through December 31, 2010, reflects that 59.4 percent of active physicians who completed medical school in Florida are practicing in Florida. Id. at 53. Only three other states retained a higher percentage of medical students. Id.

Additionally, the Office of the State Courts Administrator (OSCA) reports that medical malpractice filings in Florida have decreased significantly. During fiscal year 2003-04, a total of 5,829 professional malpractice and product liability actions were filed in Florida circuit courts, comprising 3.2 percent of all civil

actions filed that year.[8]  However, during fiscal year 2011-12, only 2,313 such actions were filed in Florida circuit courts, a decrease of more than 60 percent, and comprising just 0.76 percent of all civil actions filed.  The Annual Reports on Medical Malpractice Financial Information prepared by the Florida Office of Insurance Regulation (FLOIR Annual Report) reflect a similar decrease in both the number of claims and in the amount of noneconomic damages paid by medical malpractice insurance companies.  For example, 3,574 medical malpractice claims were closed in 2004, and insurance companies paid $195,132,457 in noneconomic damages.  2005 FLOIR Annual Report (Oct. 1, 2005) at 40, 44, available at http://www.floir.com/Office/DataReports.aspx#rec (CY2004).   On the other hand, in 2012 only 2,491 medical malpractice claims were closed, and insurance companies paid $140,941,965 in noneconomic damages, decreases of 30.3 percent and 27.7 percent, respectively.  2013 FLOIR Annual Report (Oct. 1, 2013) at 10, 88, available at http://www.floir.com/Office/DataReports.aspx#rec (CY2012).

Finally, and perhaps most telling, is that the leading companies selling medical malpractice insurance in Florida are far from struggling financially.  The 2013 FLOIR Annual Report notes:

> It is estimated that the Florida medical malpractice line of business standing alone generated a direct (before reinsurance) return on

---

8.  The OSCA combines these two types of legal actions for statistical purposes.

surplus of 14.0% in 2012. This return compares very positively with the average countrywide all-lines net return on surplus for Florida's leading medical malpractice writers of 5.3% (down from 7.1% in 2011, but not far out of line with market returns in 2012). This represents the ninth consecutive year of profitability. . . . Related financial information in the report also suggests that the leading malpractice carriers as a class are financially strong.

2013 FLOIR Annual Report at 8-9 (emphasis supplied). The most recent records and reports of the Florida Office of Insurance Regulation, and the annual reports of medical malpractice insurers, confirm that not only has the number of insurers providing medical malpractice insurance coverage increased, see 2012 FLOIR Annual Report at 40-41 and 2013 FLOIR Annual Report at 44, the profits would probably shock most concerned. Indeed, between the years of 2003 and 2010, four insurance companies that offered medical malpractice insurance in Florida cumulatively reported an increase in their net income of more than 4300 percent.[9]

---

9. The four insurance companies were The Doctors Company, Mag Mutual Insurance Company, ProAssurance Corporation, and First Professionals Insurance Company. Each of the three remaining insurance companies posts its annual reports online. See http://www.thedoctors.com/TDC/Financials/CON_ID_000780; http://www.magmutual.com/annual-reports; and http://www.proassurance.com/investorrelations/annualreport.aspx. In October 2011, the Doctors Company merged with the parent company of FPIC. See http://www.thedoctors.com/TDC/PressRoom/PressContent/CON_ID_004471. Since FPIC is no longer an independent entity, the 2003 annual report for FPIC is not available on the website for a specific insurance company, but is available at http://www.rocketfinancial.com/IRVault.aspx?fID=6352&tID=1002. Every insurance company authorized to conduct business in Florida is required to file an annual statement "of its financial condition, transactions, and affairs" with the Office of Insurance Regulation. Fla. Admin. Code R. 69O-137.001(2)(a).

With such impressive net income estimates, the insurance industry should pass savings onto Florida physicians in the form of reduced malpractice insurance premiums,[10] and it should no longer be necessary to continue punishing those most seriously injured by medical negligence by limiting their noneconomic recovery to a fixed, arbitrary amount.

Thus, even if there had been a medical malpractice crisis in Florida at the turn of the century, the current data reflects that it has subsided. No rational basis currently exists (if it ever existed) between the cap imposed by section 766.118 and any legitimate state purpose. See generally Fla. Nurses Ass'n, 508 So. 2d at 319. At the present time, the cap on noneconomic damages serves no purpose other than to arbitrarily punish the most grievously injured or their surviving family members. Moreover, it has never been demonstrated that there was a proper predicate for imposing the burden of supporting the Florida legislative scheme upon the shoulders of the persons and families who have been most severely injured and died as a result of medical negligence. Health care policy that relies upon

---

10. Despite such increases in net income, in 2012 one medical malpractice insurance company nonetheless charged obstetricians in Miami-Dade County more than $190,000 for $1 million of coverage. See 2013 FLOIR Annual Report at 57. The company charged obstetricians in other Florida counties approximately $98,000 for the same coverage. Id. at 58. During 2012, the same company charged orthopedists in Miami-Dade County more than $115,000 for $1 million of coverage, whereas orthopedists in other Florida counties were charged approximately $59,000. Id. at 57-58.

discrimination against Florida families is not rational or reasonable when it attempts to utilize aggregate caps to create unreasonable classifications. Accordingly, and for each of these reasons, the cap on wrongful death noneconomic damages in medical malpractice actions does not pass constitutional muster.

## THE REMAINING CERTIFIED QUESTIONS

We conclude that the remaining certified questions need not be addressed. With regard to the second and third questions, the provision of the Florida Constitution that governs access to courts protects those rights which existed either at common law or by statute prior to the adoption of the 1968 Declaration of Rights. See Kluger v. White, 281 So. 2d 1, 4 (Fla. 1973). Similarly, the right to trial by jury is guaranteed only in those cases where the right was enjoyed at the time the first Constitution of Florida became effective in 1845. In re 1978 Chevrolet Van, 493 So. 2d 433, 434 (Fla. 1986).

At common law, Florida did not recognize a cause of action for wrongful death. White v. Clayton, 323 So. 2d 573, 575 (Fla. 1975) ("An action for wrongful death was not authorized at common law, and is a creation of the legislature."). Moreover, although the Florida Legislature authorized an action for wrongful death prior to 1968, see, e.g., § 768.01, Fla. Stat. (1941), the right of survivors to recover noneconomic damages, such as pain and suffering, did not become part of Florida

- 40 -

statutory law until 1972.  Lifemark Hosps. of Fla., Inc. v. Afonso, 4 So. 3d 764, 769 (Fla. 3d DCA), cert. denied, 23 So. 3d 711 (Fla. 2009).

Section 766.118 caps noneconomic damages in both wrongful death medical malpractice actions and personal injury medical malpractice actions where the victim survives.  This case involves only a wrongful death medical malpractice action.  Because the right of Ms. McCall's parents and son to recover noneconomic damages for her death did not exist prior to 1972, their access to courts and jury trial challenges to section 766.118 are not cognizable.  Accordingly, to answer the second and third questions certified by the federal appellate court with regard to personal injury medical malpractice actions would constitute an advisory opinion, which we are not authorized to provide.  Sarasota-Fruitville Drainage Dist. v. Certain Lands Within Said Dist., 80 So. 2d 335, 336 (Fla. 1955) ("We have repeatedly held that this Court was not authorized to render advisory opinions except in the instances required or authorized by the Constitution.").

Our decision not to answer the fourth certified question addressing the separation of powers challenge is based upon a similar rationale.  As previously stated, with regard to wrongful death, the Florida Legislature created a cause of action where none previously existed.  Clayton, 323 So. 2d at 575.  However, section 766.118 addresses both personal injury medical malpractice actions, which previously existed under the common law, Maggio v. Fla. Dep't of Labor and

Emp. Security, 899 So. 2d 1074, 1081 n.5 (Fla. 2005) (noting that "unlike causes of action that are solely the creature of statute, medical malpractice actions existed as common law torts"), and wrongful death medical malpractice actions, which are purely a statutory creation.  Were we to answer the fourth certified question, it would constitute, in part, an impermissible advisory opinion.  Sarasota-Fruitville, 80 So. 2d at 336.  For this reason, we decline to do so.

## CONCLUSION

Based on the foregoing, we answer the first rephrased certified question in the affirmative and hold that the cap on wrongful death noneconomic damages in section 766.118, Florida Statutes, violates the Equal Protection Clause of the Florida Constitution.  We defer answering the remaining certified questions.  We return this case to the Eleventh Circuit Court of Appeals.

It is so ordered.

LABARGA, J., concurs.
PARIENTE, J., concurs in result with an opinion, in which QUINCE and PERRY, JJ., concur.
POLSTON, C.J., dissents with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.


PARIENTE, J., concurring in result.

I agree with the plurality opinion authored by Justice Lewis that the statutory cap on wrongful death noneconomic damages provided by the medical malpractice

- 42 -

statute violates the Equal Protection Clause of the Florida Constitution. Like the plurality, I would therefore answer the first rephrased certified question in the affirmative and decline to answer the remaining questions certified by the Eleventh Circuit Court of Appeals. In fact, as I explain, I agree with much of the plurality opinion that declares the statutory damages cap unconstitutional as applied to wrongful death actions.

However, I do not fully join in the plurality opinion because I respectfully disagree with the plurality's application of the rational basis test in this case. Specifically, my primary disagreement is with the decision not to afford deference to the legislative findings in the absence of a showing that the findings were "clearly erroneous." Univ. of Miami v. Echarte, 618 So. 2d 189, 196 (Fla. 1993).

Although this Court is not bound to blindly defer to all legislative findings, I disagree with the plurality's independent evaluation and reweighing of reports and data, including information from legislative committee meetings and floor debate, as well as an article published in the Palm Beach Post newspaper, as part of its review of whether the Legislature's factual findings and policy decisions as to the alleged medical malpractice crisis were fully supported by available data. See, e.g., plurality op. at 25-28 (Lewis, J.) (quoting from the legislative floor debate and committee meeting testimony and reviewing studies); id. at 29-31 (citing to and quoting from a newspaper article and quoting additional legislative committee

testimony and floor debate). I emphasize, however, that although I do not fully join in the plurality's application of the rational basis test, I agree with the ultimate conclusion that the arbitrary reduction of survivors' noneconomic damages in wrongful death cases based on the number of survivors lacks a rational relationship to the goal of reducing medical malpractice premiums.

My analysis proceeds in the following way. I first set forth the background of the case, which frames the specific constitutional question in need of this Court's resolution—a resolution the plurality and I both agree on. With this context in mind, I then explain how and why the plurality and I agree as to the as-applied unconstitutionality of the statutory cap on noneconomic damages in wrongful death actions. Finally, I discuss where my legal analysis diverges from the plurality's and why, despite my agreement with the ultimate conclusion, I am unable to fully join in the plurality opinion.

## I. Background

As described in the findings of fact of the federal district court where this litigation began, at the time of her death, Michelle McCall was a "bright, beautiful, and healthy, 20-year-old woman" who tragically "bled to death in the presence of all medical staff who were attending her" in the course of receiving prenatal care and delivery services for her pregnancy at Eglin Air Force Base's clinic. Estate of McCall v. United States, 663 F. Supp. 2d 1276, 1283, 1291 (N.D. Fla. 2009). The

facts of the medical malpractice and the circumstances of Michelle's tragic death are not in dispute or at issue before this Court. Rather, we are faced with a legal question as to the constitutionality of Florida's statutory limitation on noneconomic damages to Michelle's survivors, as set forth in section 766.118, Florida Statutes.

Section 766.118 provides in pertinent part as follows:

> (2) Limitation on noneconomic damages for negligence of practitioners.—
> (a) With respect to a cause of action for personal injury or wrongful death arising from medical negligence of practitioners, regardless of the number of such practitioner defendants, noneconomic damages shall not exceed $500,000 per claimant. No practitioner shall be liable for more than $500,000 in noneconomic damages, regardless of the number of claimants.
> (b) Notwithstanding paragraph (a), if the negligence resulted in a permanent vegetative state or death, the total noneconomic damages recoverable from all practitioners, regardless of the number of claimants, under this paragraph shall not exceed $1 million. In cases that do not involve death or permanent vegetative state, the patient injured by medical negligence may recover noneconomic damages not to exceed $1 million if:
> 1. The trial court determines that a manifest injustice would occur unless increased noneconomic damages are awarded, based on a finding that because of the special circumstances of the case, the noneconomic harm sustained by the injured patient was particularly severe; and
> 2. The trier of fact determines that the defendant's negligence caused a catastrophic injury to the patient.
> (c) The total noneconomic damages recoverable by all claimants from all practitioner defendants under this subsection shall not exceed $1 million in the aggregate.

§ 766.118, Fla. Stat. (2005).

As to noneconomic damages, Michelle left as survivors her parents and her baby boy, who was born at the same time Michelle died. The federal district court found as follows as to the child's noneconomic damages:

> W.W., who is now a healthy and active 3 1/2 year-old boy [as of 2009], has been deprived the privilege of ever knowing his mother, of having her comfort and emotional support throughout his and her shared lifetimes, and of benefitting from her guidance and companionship. The negligent conduct in this case occurred within a matter of hours of his birth, but it leaves for W.W. a void in his life that will never truly be filled. His pain and suffering are difficult to quantify, but no one disputes the magnitude of his loss. On the other hand, the court is mindful that W.W.'s pain is necessarily tempered by his age at the time of his mother's death. He lives with the pain of never knowing her, but not with the pain that comes from suddenly losing the love and companionship of a parent one has bonded with emotionally. W.W.'s life, while shadowed by this tragedy, will be lived with the love of those who have surrounded him from infancy— his father and his grandparents—not the pain of a conscious memory of his mother's death. The court does not intend to minimize the loss of one's mother; such is an obvious and enormous loss. The court simply finds that the pain and suffering for W.W. is tempered by his infancy at the time of his mother's death, a factor that should be reflected in the noneconomic damage award. To compensate for W.W.'s loss of parental companionship, instruction, and guidance and for his mental pain and suffering, the court awards $500,000.00.

Id. at 1293-94 (footnote omitted).

As to Michelle's parents, Edward M. and Margarita F. McCall, the federal district court awarded $750,000 to each for their pain and suffering, explaining as follows:

> There is no question, as shown by the evidence, that Mr. and Mrs. McCall were both very close to their daughter and that this tragedy has greatly impacted the quality of their lives, emotionally as

well as physically. They were otherwise healthy, active, and excited about helping their daughter and new grandson. They went to the hospital with the happy and hopeful expectation of bringing their daughter home with a healthy baby but instead found themselves faced with the agonizing decision of whether to remove life support from her. Mr. McCall struggled as he recounted their hope of Michelle possibly regaining consciousness as they laid W.W. across her before she died, and also so they could have one photograph of her "holding" her baby before she died. The pain from the loss of their only daughter and the mental agony of having to make the decision to remove her from life support will not soon abate, if ever in their lifetimes. The court takes into consideration, however, that because of their relationship as a married couple, they will both undeniably benefit from each other's noneconomic damage award.

Id. at 1294.

As set forth by the plurality, because section 766.118(2) caps total noneconomic damages recoverable by all claimants at $1 million, each of these three independent survivors had his or her award of noneconomic damages significantly reduced so that the damages were proportionally divided so as not to exceed the statutory cap. In other words, instead of receiving the full amount of noneconomic damages awarded by the federal district court, none of which individually exceeded $1 million, each individual survivor was treated differently as to his or her noneconomic damages award because there was more than one survivor entitled to noneconomic damages in this case.

This is where the equal protection argument addressed by the plurality becomes important. Critically, as I explain in the next section, despite not fully joining in the plurality opinion, I do agree that the noneconomic damages cap

violates Florida's Equal Protection Clause as applied to wrongful death actions under the constitutional rational basis test.

## II.  Agreement with the Plurality Opinion

I agree with the plurality opinion as to the following issues.  First, I agree that there are two prongs to the rational basis test, requiring the Court to consider both whether the statute serves a legitimate governmental purpose and whether the Legislature was reasonable in its belief that the challenged classification would promote that purpose.  See, e.g., Hechtman v. Nations Title Ins. of N.Y., 840 So. 2d 993, 996 (Fla. 2003).  As this Court explained in one of its most recent applications of the rational basis test in the equal protection context, "[t]o be entitled to relief under the rational basis test, the [challengers] must show that the [challenged statute] does not 'bear some rational relationship to legitimate state purposes.' " Samples v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 114 So. 3d 912, 917 (Fla. 2013) (quoting Westerheide v. State, 831 So. 2d 93, 110 (Fla. 2002)).  It is not this Court's "task 'to determine whether the legislation achieves its intended goal in the best manner possible, but only whether the goal is legitimate and the means to achieve it are rationally related to the goal.' " Samples, 114 So. 3d at 917 (quoting Loxahatchee River Envtl. Control Dist. v. Sch. Bd. of Palm Beach Cnty., 496 So. 2d 930, 938 (Fla. 4th DCA 1986)).

Second, I also agree that this Court's role is not to simply "rubber stamp" the Legislature's actions. Plurality op. at 20 (Lewis, J.). Indeed, although this Court's case law requires deference to the Legislature's factual determinations, see Echarte, 618 So. 2d at 196, this Court's precedent also clearly establishes that the Legislature's findings "must actually be findings of fact" and are not entitled to the presumption of correctness "if they are nothing more than recitations amounting only to conclusions." Moore v. Thompson, 126 So. 2d 543, 549 (Fla. 1960) (quoting Seagram-Distillers Corp. v. Ben Greene, Inc., 54 So. 2d 235, 236 (Fla. 1951)).

Third, and most importantly, I agree with the plurality's conclusion that the statutory cap on noneconomic damages is unconstitutional as applied to wrongful death actions. In my view, the Court's controlling precedent in St. Mary's Hospital, Inc. v. Phillipe, 769 So. 2d 961, 971 (Fla. 2000), is directly on point in holding that this type of statutory scheme is improper because "[d]ifferentiating between a single claimant and multiple claimants bears no rational relationship to the Legislature's stated goal of alleviating the financial crisis in the medical liability insurance industry." Id.

Indeed, as the plurality correctly notes, this Court "clearly announced in Phillipe that aggregate caps or limitations on noneconomic damages violate equal protection guarantees under the Florida Constitution when applied without regard

- 49 -

to the number of claimants entitled to recovery." Plurality op. at 10 (Lewis, J.). I agree with the plurality that this "inherently discriminatory action and resulting invidious discrimination do not pass constitutional muster." Id.

The rationale of Phillipe is particularly applicable in this case given that, in capping wrongful death noneconomic damages regardless of the number of survivors, the only asserted legitimate State interest is the alleviation of rising medical malpractice insurance premiums paid by the affected doctors. However, as the plurality explains, there is no mechanism in place to assure that savings are actually passed on from the insurance companies to the doctors. See plurality op. at 31-34 (Lewis, J.) (explaining that section 766.118 contains no requirement that insurance companies use the acquired savings to lower malpractice premiums, discussing how subdivision (8) was subsequently repealed, and reviewing the reasoning of other courts that have expressed concern about the constitutionality of a damages cap in light of this missing link).

Of course, the statutory cap on noneconomic damages provides no commensurate benefit to the victims of medical malpractice, and if there is also no commensurate benefit to the doctors and hospitals involved in medical malpractice litigation, then only the insurance companies benefit in the form of an increase in profits. See id. This critical missing link causes me to believe that the statutory cap on noneconomic damages in medical malpractice actions not only fails the

- 50 -

smell test, but the rational basis test as well, especially in light of the fact that subdivision (8) was repealed as "obsolete." See id. at 33. In other words, the statutory cap on noneconomic damages fails the rational basis test because "the Legislature could not have had any reasonable ground for believing that there were public considerations justifying the particular classification and distinction made," North Ridge General Hospital, Inc. v. City of Oakland Park, 374 So. 2d 461, 465 (Fla. 1979), since an aggregate cap on damages without regard to the number of claimants bears no rational relationship to the asserted State interest in "alleviating the financial crisis in the medical liability insurance industry." Phillipe, 769 So. 2d at 971.

Finally, I strongly agree with the plurality that "even if a 'crisis' existed when section 766.118 was enacted, a crisis is not a permanent condition." Plurality op. at 35 (Lewis, J.). As I stated in my dissent in Mizrahi v. North Miami Medical Center, Ltd., 761 So. 2d 1040 (Fla. 2000):

> There is no indication that the past medical malpractice crisis continues into the present. If the medical malpractice crisis does not continue into the present, I fail to see how a past crisis can justify the permanent exclusion of an entire class of victims from seeking compensation for pain and suffering damages due to the wrongful death of their parents as a result of medical malpractice.
> Indeed, it is a "settled principle of constitutional law" that although a statute is constitutionally valid when enacted, that statute may become constitutionally invalid due to changes in the conditions to which the statute applies. See Conner v. Cone, 235 So. 2d 492, 498 (Fla. 1970); see also Georgia S. & F. Ry. Co. v. Seven-Up Bottling Co. of Southeast Ga., 175 So. 2d 39, 40 (Fla. 1965). Accordingly,

- 51 -

> while it is not our role to reexamine legislative fact-finding, we also need not blindly accept the Legislature's conclusions, especially when such conclusions may no longer be valid due to changed conditions. See Seagram-Distillers Corp. v. Ben Greene, Inc., 54 So. 2d 235, 236 (Fla. 1951); see also Conner, 235 So. 2d at 498.
>
> . . . .
>
> All other adult children who lose their parents as a result of other negligent conduct have the right to recover pain and suffering damages if their parent died without a spouse. See § 768.21(8), Fla. Stat. (1999). However, in the case of adult children of medical malpractice victims, the Legislature has denied compensation for mental pain and suffering not because the claims of the adult children are meritless, but because of the adult children's age and because their parents died as a result of medical malpractice. . . .
>
> . . . .
>
> In sum, there is no indication that the distinction drawn by the statute bears a reasonable relationship to a legitimate state interest associated with ensuring accessible health care. Further, there is no indication that the medical malpractice crisis that formed the basis for treating this class of survivors differently than all other adult children even continues to this day. I therefore believe that the challengers of this statute have met their burden and have demonstrated that the distinction drawn by the Legislature is arbitrary.

Id. at 1043-44 (Pariente, J., dissenting) (emphasis added) (footnote omitted).

The same reasons that led me to conclude that the continued deprivation of wrongful death actions to a class of survivors in medical malpractice actions was a denial of equal protection in Mizrahi apply in this context as well. There is no evidence of a continuing medical malpractice crisis that would justify the arbitrary reduction of survivors' noneconomic damages in wrongful death cases based on the number of survivors. This arbitrary reduction punishes the survivors of victims of medical malpractice without any commensurate benefit to the survivors and

- 52 -

without a rational relationship to the goal of reducing medical malpractice premiums. Accordingly, like the plurality, I would answer the first rephrased certified question in the affirmative and hold that Florida's statutory cap on noneconomic damages is unconstitutional as applied to wrongful death actions.

### III. Disagreement with the Plurality Opinion

Although I agree with many aspects of the plurality opinion and with the ultimate conclusion as to the unconstitutionality of the statute, I cannot join in all of the plurality's legal analysis. In particular, my disagreement stems from my view that our precedent does not allow this Court to engage in the type of expansive review of the Legislature's factual and policy findings that the plurality engages in when undertaking a constitutional rational basis analysis.

I emphasize that I have no reason to question the plurality's excellent scholarship regarding the flaws in the Legislature's conclusions as to the existence of a medical malpractice crisis. See plurality op. at 18-28 (Lewis, J.). In my view, however, the rational basis test articulated by this Court, based on precedent from the United States Supreme Court, is a deferential standard. As explained by this Court in Echarte, 618 So. 2d at 196, "the Legislature's factual and policy findings are presumed correct" in a rational basis analysis unless there has been a showing made that the findings are "clearly erroneous."

The plurality relies on a case, North Florida Women's Health and Counseling Services, Inc. v. State, 866 So. 2d 612, 627 (Fla. 2003), involving a fundamental right, for the proposition that "courts must conduct their own inquiry" of the Legislature's findings.  See plurality op. at 21 (Lewis, J.).  My primary disagreement with the plurality's analysis begins with the extensive discussion that questions the "alleged medical malpractice crisis" and relies on North Florida Women's Health to support the plurality's review of available data to consider the "factors and circumstances involved."  Plurality op. at 18, 21 (Lewis, J.).

North Florida Women's Health involved the fundamental right to privacy, which required strict scrutiny review, rather than rational basis review, and in North Florida Women's Health, a trial court had made findings of fact based on a trial where both parties had the opportunity to present evidence on the underlying issues.  See N. Fla. Women's Health, 866 So. 2d at 616.  Although the plurality capably demonstrates that the Legislature's conclusions as to the existence of a medical malpractice crisis may be questionable, I respectfully conclude that there is simply no precedent for this Court to engage in its own independent evaluation and reweighing of the facts and legislative policy findings, as done by the plurality, when conducting a rational basis analysis.

The plurality asserts that Warren v. State Farm Mutual Automobile Insurance Co., 899 So. 2d 1090, 1095 (Fla. 2005), stands for the proposition that

the rational basis test envisions judicial consideration of the existing factors and circumstances to determine whether the legislative findings were fully supported. My review of <u>Warren</u> and the cases on which it relied, however, reveals that this Court has never engaged in the type of expansive, independent review when conducting a rational basis inquiry that the plurality undertakes in this case. Instead, as <u>Warren</u> explained, the rational basis test must be undertaken "in a light deferential to the Legislature's action." <u>Warren</u>, 899 So. 2d at 1096.

Accordingly, in my view, despite the plurality's thoughtful and scholarly approach to analyzing the alleged justification for the medical malpractice crisis, there has been no showing made in this case that the Legislature's findings as to the existence of a crisis at that time were "clearly erroneous." <u>Echarte</u>, 618 So. 2d at 196. I emphasize again, however, that I agree with many aspects of the plurality opinion, particularly the conclusion that the arbitrary reduction of survivors' noneconomic damages in wrongful death cases based on the number of survivors lacks a rational relationship to the goal of reducing medical malpractice premiums.

### IV. Conclusion

Based on the above, I concur with the plurality's decision to hold the cap on wrongful death noneconomic damages in medical malpractice actions unconstitutional but do not join in all of the plurality opinion's reasoning. QUINCE and PERRY, JJ., concur.

POLSTON, C.J., dissenting.

I respectfully dissent because the plurality disregards the rational basis standard prescribed by our precedent as well as the Legislature's policy role under Florida's constitution. The Legislature's policy choice of enacting a cap of $1 million on noneconomic damages in medical malpractice cases involving death is rationally related to the legitimate state interest of decreasing medical malpractice insurance rates and increasing the affordability and availability of health care in Florida. Therefore, under our precedent, the cap does not violate Florida's constitutional guarantee of equal protection. It also does not violate the access to courts, jury trial, and separation of powers provisions of the Florida Constitution. Accordingly, I would answer the four certified questions posed by the Eleventh Circuit Court of Appeals in the negative.

## I. Background

Justice Lewis' plurality opinion accurately quotes the Eleventh Circuit's description of Michelle McCall's tragic death following the birth of her son. Ms. McCall's parents and her son's father (on behalf of her son) filed suit against the United States pursuant to the Federal Tort Claims Act (FTCA), which provides that the United States is liable for torts to the same extent as a private individual would be under the applicable state's law. Estate of McCall v. United States, 642 F.3d 944, 947 (11th Cir. 2011); Estate of McCall v. United States, 663 F. Supp. 2d

- 56 -

1276, 1288 (N.D. Fla. 2009). After a two-day bench trial, the federal district court ruled that the United States was liable for Ms. McCall's death and found that "Plaintiffs' economic damages, or financial losses, amounted to $980,462.40." McCall, 642 F.3d at 947. Additionally, the federal district court "found that Plaintiffs' noneconomic damages, or nonfinancial losses, totaled $2 million, including $500,000 for Ms. McCall's son and $750,000 for each of her parents." Id. The federal district court then applied Florida's statutory cap pursuant to section 766.118(2), Florida Statutes (2005), to limit Plaintiffs' recovery for noneconomic damages to an aggregate of $1 million. Id. The $1 million capped amount for noneconomic damages "will be equitably divided among the eligible survivors in proportion to their respective awards." McCall, 663 F. Supp. 2d at 1295. The federal district court "also denied Plaintiffs' motion challenging the constitutionality of Florida's statutory cap under both the Florida and United States Constitutions." McCall, 642 F.3d at 947.

On appeal, the Eleventh Circuit considered multiple constitutional challenges to Florida's statutory cap on noneconomic damages. First, the Eleventh Circuit applied rational basis review to hold that Florida's cap does not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution. Id. at 950-51. The Eleventh Circuit reasoned as follows:

> Plantiffs ask us to second guess the legislature's judgment in enacting a "per incident" rather than "per claimant" statutory cap. However,

"equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Beach Commc'ns, Inc., 508 U.S. at 313. The legislature identified a legitimate governmental purpose in passing the statutory cap, namely to reduce the cost of medical malpractice premiums and health care. See Fla. Stat. § 766.201. The means that Florida chose, a per incident cap on noneconomic damages, bears a rational relationship to that end. The Florida legislature could reasonably have concluded that such a cap would reduce damage awards and in turn make medical malpractice insurance more affordable and healthcare more available.

Id. at 951. The Eleventh Circuit also rejected the plaintiffs' argument that the cap fails rational basis review because "the Florida legislature 'had no objective, factual basis for believing' that a cap on noneconomic damages . . . would reduce the cost of medical malpractice insurance." Id. at 950. To the contrary, the Eleventh Circuit found the Legislature issued a report on the issue, held public hearings, heard expert testimony, and reviewed another report prepared by the Governor's Task Force that recommended a per incident cap to remedy the problem. Id. at 950-51.

Additionally, the Eleventh Circuit held that the cap on noneconomic damages does not constitute a taking either under the Fifth Amendment to the United States Constitution or under section 6 of article X of the Florida Constitution. Id. at 951. The Eleventh Circuit stated that the cap does not deprive the plaintiffs of a vested right, explaining that the cap was enacted in 2003 before the medical malpractice at issue in the case took place in 2006. Id.

Finally, rather than deciding the plaintiffs' remaining challenges to the cap under the Florida Constitution, the Eleventh Circuit certified to this Court the following questions:

> (1) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the right to equal protection under Article I, Section 2 of the Florida Constitution?
>
> (2) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the right of access to the courts under Article I, Section 21 of the Florida Constitution?
>
> (3) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the right to trial by jury under Article I, Section 22 of the Florida Constitution?
>
> (4) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the separation of powers guaranteed by Article II, Section 3 and Article V, Section 1 of the Florida Constitution?

Id. at 952-53.

## II.  Florida's Caps on Noneconomic Damages

Section 766.118, Florida Statutes (2005), places limitations on noneconomic damages[11] in medical malpractice cases, and the limitations vary depending upon the circumstances.  For cases involving the negligence of practitioners providing

---

11.  Section 766.202(8), Florida Statutes (2005), defines noneconomic damages as "nonfinancial losses that would not have occurred but for the injury giving rise to the cause of action, including pain and suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of capacity for enjoyment of life, and other nonfinancial losses to the extent the claimant is entitled to recover such damages under general law, including the Wrongful Death Act."

nonemergency care, the limitation is $500,000 per claimant, per incident, and per

practitioner:

> With respect to a cause of action for personal injury or wrongful death
> arising from medical negligence of practitioners, regardless of the
> number of such practitioner defendants, noneconomic damages shall
> not exceed $500,000 per claimant.  No practitioner shall be liable for
> more than $500,000 in noneconomic damages, regardless of the
> number of claimants.

§ 766.118(2)(a), Fla. Stat. (2005).  If the negligence resulted in death or a

permanent vegetative state, the cap rises to $1 million:

> Notwithstanding paragraph (a), if the negligence resulted in a
> permanent vegetative state or death, the total noneconomic damages
> recoverable from all practitioners, regardless of the number of
> claimants, under this paragraph shall not exceed $1 million.

§ 766.118(2)(b), Fla. Stat. (2005).  The cap also rises to $1 million dollars in the

absence of death or a permanent vegetative state if the trial court determines that a

manifest injustice would occur or if the negligence resulted in a catastrophic injury.

Id.  However, section 766.118(2)(c), Florida Statutes (2005), emphasizes that

"[t]he total noneconomic damages recoverable by all claimants from all

practitioner defendants under this subsection shall not exceed $1 million in the

aggregate."

For cases involving nonpractitioners providing nonemergency care, the

limitation is $750,000.  § 766.118(3)(a), Fla. Stat. (2005).  This cap rises to $1.5

million if the negligence caused a permanent vegetative state or death or if the trial

court determines that a manifest injustice would occur or if the trier of fact determines that a catastrophic injury resulted. § 766.118(3)(b), Fla. Stat. (2005). And section 766.118(3)(d), Florida Statutes (2005), provides that "[t]he total noneconomic damages recoverable by all claimants from all nonpractitioner defendants under this subsection shall not exceed $1.5 million in the aggregate."

These limitations on noneconomic damages are part of an overall legislative plan enacted in 2003 to address the rising costs of medical liability insurance and the affordability and availability of healthcare in Florida. See ch. 2003-416, Laws of Fla. Other components of the plan include new healthcare facilities regulations, insurance regulation, license requirements, and agency requirements. Id.

The legislative effort began with the convening of the House Select Committee on Medical Liability Insurance, which "conducted an inquiry into the possible causes and potential solutions to the vexing problems associated with the availability of medical liability insurance in Florida." Fla. H. Select Comm. on Med. Liab. Ins., Select Comm. on Med. Liab. Ins. Rep., at 2 (March 2003) (available at Fla. Dept. of State, Fla. State Archives, Tallahassee, Fla.). The Select Committee examined "how the reduced availability of affordable medical liability insurance affects the availability of medical services" and was "mindful of the need to maintain the right of access to redress when citizens are harmed during the delivery of medical services." Id. at 3. The Select Committee held a series of

meetings in Tallahassee, held four hearings outside the capital, and published an 82 page report (not including appendices).  Id.  It "received testimony from experts in each of the professional areas impacted" and reviewed records from efforts to address prior crises.  Id. at 4.

The Select Committee also reviewed the record of the Governor's Select Task Force on Health Care Professional Liability Insurance, which produced a "345 page report as well as thirteen volumes of supportive materials."  Id. at 9. The Governor's Task Force "undertook a comprehensive review of published studies and relevant literature" and held ten meetings at which it received extensive testimony and information.  Gov.'s Select Task Force on Healthcare Prof. Liab. Ins., Gov.'s Task Force on Healthcare Prof. Liab. Ins. Rep., at 3, iv (2003).  The five members of the Governor's Task Force were (1) John Hitt, President of University of Central Florida, (2) Richard Beard, Trustee of University of South Florida, (3) Marshall Criser, Jr., President Emeritus of University of Florida, (4) Fred Gainous, President of Florida A&M University, and (5) Donna Shalala, President of University of Miami.  Id. at 3.  In the end, the Legislature based many of its findings and its policies upon the work of the Governor's Task Force, including the per incident cap on noneconomic damages.  See, e.g., ch. 2003-416, § 1, Laws of Fla.

Specifically, when enacting chapter 2003-416, Laws of Florida, the Legislature made the following findings:

(1) The Legislature finds that Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude.

(2) The Legislature finds that this crisis threatens the quality and availability of health care for all Florida citizens.

(3) The Legislature finds that the rapidly growing population and the changing demographics of Florida make it imperative that students continue to choose Florida as the place they will receive their medical educations and practice medicine.

(4) The Legislature finds that Florida is among the states with the highest medical malpractice insurance premiums in the nation.

(5) The Legislature finds that the cost of medical malpractice insurance has increased dramatically during the past decade and both the increase and the current cost are substantially higher than the national average.

(6) The Legislature finds that the increase in medical malpractice liability rates is forcing physicians to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk procedures, or to retire early from the practice of medicine.

(7) The Legislature finds that there are certain elements of damage presently recoverable that have no monetary value, except on a purely arbitrary basis, while other elements of damage are either easily measured on a monetary basis or reflect ultimate monetary loss.

(8) The Governor created the Governor's Select Task Force on Healthcare Professional Liability Insurance to study and make recommendations to address these problems.

(9) The Legislature has reviewed the findings and recommendations of the Governor's Select Task Force on Healthcare Professional Liability Insurance.

(10) The Legislature finds that the Governor's Select Task Force on Healthcare Professional Liability Insurance has established that a medical malpractice crisis exists in the State of Florida which can be alleviated by the adoption of comprehensive legislatively enacted reforms.

(11) The Legislature finds that making high-quality health care available to the citizens of this state is an overwhelming public necessity.

(12) The Legislature finds that ensuring that physicians continue to practice in Florida is an overwhelming public necessity.

(13) The Legislature finds that ensuring the availability of affordable professional liability insurance for physicians is an overwhelming public necessity.

(14) The Legislature finds, based upon the findings and recommendations of the Governor's Select Task Force on Healthcare Professional Liability Insurance, the findings and recommendations of various study groups throughout the nation, and the experience of other states, that the overwhelming public necessities of making quality health care available to the citizens of this state, of ensuring that physicians continue to practice in Florida, and of ensuring that those physicians have the opportunity to purchase affordable professional liability insurance cannot be met unless a cap on noneconomic damages is imposed.

(15) The Legislature finds that the high cost of medical malpractice claims can be substantially alleviated by imposing a limitation on noneconomic damages in medical malpractice actions.

(16) The Legislature further finds that there is no alternative measure of accomplishing such result without imposing even greater limits upon the ability of persons to recover damages for medical malpractice.

(17) The Legislature finds that the provisions of this act are naturally and logically connected to each other and to the purpose of making quality health care available to the citizens of Florida.

(18) The Legislature finds that each of the provisions of this act is necessary to alleviate the crisis relating to medical malpractice insurance.

### III. Equal Protection

McCall argues that Florida's cap of $1 million on noneconomic damages pursuant to section 766.118(2)(b), Florida Statutes, violates the right to equal protection under the Florida Constitution by imposing additional burdens when an

act of medical negligence gives rise to multiple claims as well as when the negligent act causes severe injuries. However, under the rational basis test our precedent requires, McCall's argument is without merit.

Article I, section 2 of the Florida Constitution provides that "[a]ll natural persons, female and male alike, are equal before the law. . . ." Florida's courts have interpreted this provision consistently with interpretations of the equal protection clause of the United States Constitution. See, e.g., Duncan v. Moore, 754 So. 2d 708, 712 (Fla. 2000); Sasso v. Ram Prop. Mgmt., 431 So. 2d 204, 211 (Fla. 1st DCA 1983).

As this Court explained in Duncan, 754 So. 2d at 712 (citations omitted),

> [e]qual protection is not violated merely because some persons are treated differently than other persons. It only requires that persons similarly situated be treated similarly. In the absence of a fundamental right or a protected class, equal protection demands only that a distinction which results in unequal treatment bear some rational relationship to a legitimate state purpose. This is known as the rational basis test.

In this case, McCall argues that section 766.118(2)(b)'s cap on noneconomic damages creates unequal treatment between those with noneconomic damages over the cap and those with noneconomic damages under the cap, claiming that the most severely injured are discriminated against. McCall also claims that the per incident cap creates a discriminatory classification between those who are members of larger families and those who are not. Because these alleged classifications do not

- 65 -

involve a protected class or a fundamental right, McCall's equal protection claim

must be analyzed using the rational basis test.

"Under a 'rational basis' standard of review a court should inquire only

whether it is conceivable that the regulatory classification bears some rational

relationship to a legitimate state purpose[:]"

> The burden is upon the party challenging the statute or regulation to show that there is no conceivable factual predicate which would rationally support the classification under attack. Where the challenging party fails to meet this difficult burden, the statute or regulation must be sustained.

Fla. High Sch. Activities Ass'n v. Thomas, 434 So. 2d 306, 308 (Fla. 1983); see

also Westerheide v. State, 831 So. 2d 93, 112 (Fla. 2002). It is not the judiciary's

task under the rational basis standard "to determine whether the legislation

achieves its intended goal in the best manner possible, but only whether the goal is

legitimate and the means to achieve it are rationally related to the goal."

Loxahatchee River Envtl. Control Dist. v. Sch. Bd. of Palm Beach Cnty., 496 So.

2d 930, 938 (Fla. 4th DCA 1986).

This Court has employed the rational basis test in its prior decisions

involving equal protection challenges to limitations on damages in medical

malpractice cases. For example, in Pinillos v. Cedars of Lebanon Hospital Corp.,

403 So. 2d 365 (Fla. 1981), this Court applied a rational basis analysis when

rejecting an equal protection challenge under both the Florida and federal

constitutions to a statute that required judgments in medical malpractice actions to be reduced by amounts received from collateral sources. This Court explained that the Legislature, when enacting the statute, had determined that there was a medical malpractice liability insurance crisis in Florida that was threatening public health. Pinillos, 403 So. 2d at 367. Then, this Court concluded that "the classification created by section 768.50[, Florida Statutes (1979),] bears a reasonable relationship to the legitimate state interest of protecting the public health by ensuring the availability of adequate medical care for the citizens of this state." Id. at 368.

In 1993, in a case primarily denying an access to courts challenge, this Court held that caps on noneconomic damages in certain medical malpractices cases did not violate equal protection under either the United States or Florida constitutions. See Univ. of Miami v. Echarte, 618 So. 2d 189 (Fla. 1993) ("[W]e have also considered the other constitutional claims and hold that the statutes do not violate the right to trial by jury, equal protection guarantees, substantive or procedural due process rights, the single subject requirement, the taking clause, or the non-delegation doctrine."). The statutes at issue in Echarte capped noneconomic damages in medical malpractice cases at $250,000 if the parties agreed to arbitrate. Id. at 193 (describing section 766.207(7), Fla. Stat. (Supp. 1988)). They also capped noneconomic damages at $350,000 if the plaintiff proceeded to trial after

refusing a defendant's offer to arbitrate.  Id. (describing section 766.209(4), Fla. Stat. (Supp. 1988)).

Thereafter, in April 2000, this Court held that the statute precluding adult children from recovering noneconomic damages for a parent's death due to medical malpractice did not violate the equal protection guarantees of the Florida and federal constitutions.  See Mizrahi v. N. Miami Med. Ctr., 761 So. 2d 1040 (Fla. 2000).  In Mizrahi, this Court employed the rational basis test and explained that "the Legislature referred to and discussed the medical malpractice crisis and its adverse impact on the accessibility of health care during the passage of section 768.21."  Id. at 1042.  And this Court stated that it had previously recognized the medical malpractice crisis as a legitimate state interest in Echarte.  Id. at 1042 n.3. This Court further explained that "limiting claims that may be advanced by some claimants would proportionally limit claims made overall and would directly affect the cost of providing health care by making it less expensive and more accessible." Id. at 1043.  Thus, because the exclusion is rationally related to controlling costs and healthcare accessibility, the statute at issue in Mizrahi did not violate equal protection.  Id.

But, in June 2000, this Court in dicta expressed equal protection concerns about the noneconomic damages caps that had previously passed constitutional muster in Echarte.  See St. Mary's Hosp. v. Phillipe, 769 So. 2d 961 (Fla. 2000).

In Phillipe, this Court held that the noneconomic damages caps under section 766.207 applied to claimants individually rather than on a per incident basis. 769 So. 2d at 972. In reaching this holding, this Court first concluded that "section 766.207(7)(b) is neither clear nor unambiguous." Id. at 968. Then, this Court found that the Legislature's intent with the statute was to "provide substantial incentives to claimants and defendants to voluntarily submit their cases to binding arbitration" and that this intent "can be obtained by interpreting section 766.207(7)(b) so that each claimant is fairly and reasonably compensated for his or her pain and suffering." Id. at 970. Moreover, this Court stated, "were we to interpret the noneconomic damages cap to apply to all claimants in the aggregate, we conclude that such an interpretation would create equal protection concerns." Id. at 971. Thus, this Court mentioned in Phillipe that "[d]ifferentiating between a single claimant and multiple claimants bears no rational relationship to the Legislature's stated goal of alleviating the financial crisis in the medical liability insurance industry." Id.

However, this Court very recently rejected a challenge that was nearly identical to the equal protection concern this Court had mentioned in Phillipe. Specifically, in Samples v. Florida Birth-Related Neurological Injury Compensation Ass'n, 114 So. 3d 912, 917 (Fla. 2013), the Samples argued that the $100,000 parental award under the Florida Birth-Related Injury Compensation

- 69 -

Plan violated equal protection under the Florida and federal constitutions because "those parents who apply for an award alone can receive twice the amount awarded to parents who share or split a parental award." Applying the rational basis test, this Court in Samples concluded that "[l]imiting the parental award to $100,000 per claim—as opposed to per parent—is rationally related to maintaining the actuarial soundness of the Plan." Id. Therefore, this Court upheld the statutory provision. Id.

Similar to this Court's precedent, the Third, Fourth, Fifth, Sixth, Ninth, and Eleventh Circuits have all upheld limitations on noneconomic damages in medical malpractice cases against equal protection challenges. See McCall, 642 F.3d at 951; Smith v. Botsford Gen. Hosp., 419 F.3d 513, 520 (6th Cir. 2005) ("By limiting at least one component of health care costs, the noneconomic damages limitation is rationally related to its intended purpose.") (quoting Zdrojewski v. Murphy, 657 N.W.2d 721, 739 (Mich. Ct. App. 2002)); Boyd v. Bulala, 877 F.2d 1191, 1197 (4th Cir. 1989) (holding that cap on all damages, including economic damages, does not deny equal protection because it "bears a reasonable relation to a valid legislative purpose—the maintenance of adequate health care services in the Commonwealth of Virginia"); Davis v. Omitowoju, 883 F.2d 1155, 1158 (3d Cir. 1989) ("Clearly the Virgin Island's decision to curb, through legislation, the high costs of malpractice insurance and thereby promote quality medical care to

the residents of the islands, provides a rational basis for capping the amount of damages that can be awarded a plaintiff."); Lucas v. United States, 807 F.2d 414, 422 (5th Cir. 1986) ("Lucas has failed to convince us that there is no reasonable basis for the Texas legislature to conclude that this ceiling on recovery from certain institutions is not conceivably related to the availability and cost of malpractice insurance and that such insurance and the distribution of medical care in Texas are not conceivably linked."); Hoffman v. United States, 767 F.2d 1431, 1437 (9th Cir. 1985) ("The record clearly supports a finding that the California Legislature had a 'plausible reason' to believe that the limitations on noneconomic recovery would limit the rise in malpractice insurance costs.").

Additionally, multiple state courts have rejected equal protection challenges to statutory caps on noneconomic damages. See, e.g., Fein v. Permanente Med. Grp., 695 P.2d 665 (Cal. 1985); Zdrojewski v. Murphy, 657 N.W.2d 721 (Mich. Ct. App. 2002); Adams v. Children's Mercy Hosp., 832 S.W.2d 898 (Mo. 1992), overruled on other grounds by Watts v. Lester E. Cox Med. Ctrs., 376 S.W.3d 633, 636 (Mo. 2012); Judd v. Drezga, 103 P.3d 135 (Utah 2004); Etheridge v. Med. Ctr. Hosps., 376 S.E.2d 525 (Va. 1989); Robinson v. Charleston Area Med. Ctr. Inc., 414 S.E.2d 877 (W. Va. 1991).

Applying our rational basis precedent, it is clear that the statutory cap in this case passes constitutional muster. When enacting the noneconomic damages cap

at issue here, the Legislature found that "Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude" and that "this crisis threatens the quality and availability of health care for all Florida citizens." Ch. 2003-416, at § 1. The Legislature concluded that the "cost of medical malpractice insurance has increased dramatically during the past decade" and that "both the increase and the current cost are substantially higher than the national average." Id. As a result, physicians are being forced "to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk procedures, or to retire early from the practice of medicine." Id.

This Court has previously recognized the existence of a medical malpractice insurance crisis as a legitimate state interest. See Mizrahi, 761 So. 2d at 1042 n.3; Echarte, 618 So. 2d at 196-97. Further, it is undisputed that increasing the quality, availability, and affordability of health care for Floridians is a legitimate state interest. And the Legislature's policy choice of enacting a cap on noneconomic damages in medical malpractice cases is rationally related to these state interests. As this Court explained in Mizrahi, 761 So. 2d at 1043, "limiting claims that may be advanced by some claimants would proportionally limit claims made overall and would directly affect the costs of providing health care by making it less expensive and more accessible." In fact, "it is hard to conceive a more rational means of assuaging the fear of huge damage awards and reining in insurance costs

in the case of a victim's death than by limiting noneconomic wrongful death damages." Maurin v. Hall, 682 N.W.2d 866, 890-91 (Wis. 2004).

More specifically, the Florida Legislature could have rationally believed that the cap on noneconomic damages under section 766.118(2)(b) would reduce malpractice damage awards, which would thereby increase predictability in the medical malpractice insurance market and lead to reduced insurance premiums. Then, as a result of decreased insurance premiums, physicians would be more willing to stay in Florida and perform high-risk procedures at a lower cost to Floridians.[12]

McCall contends that the cap at issue in this case violates Florida's equal protection guarantee because it applies on a per incident, rather than a per claimant,

---

12. In fact, the Governor's Task Force, upon which the Legislature expressly relied, concluded as much:

[I]mposing caps on non-economic damages in medical malpractice cases will significantly reduce the exposure of Florida healthcare providers to risk of loss from jury awards of inherently subjective damages. Such a reduction of risk will make malpractice losses much more predictable, and thereby lead to stability in malpractice insurance premium rates.

A reduction in potential liability and resulting stability will encourage more malpractice insurers to participate in the Florida market. This, along with the reduced exposure to risk, will permit insurers to charge lower premiums, on a sound financial basis. Lower premiums will encourage providers (particularly those in high-risk specialties) to offer healthcare services to Floridians, and persons visiting this state, and to do so at lower prices.

Gov.'s Task Force Report, at xvii.

basis. However, the Legislature could have reasonably believed that a per incident cap would more effectively reduce noneconomic damages awards and create more stability in the insurance market than a per claimant cap would. A per incident cap leads to more predictability in the insurance market since the noneconomic damages cannot exceed the cap in any particular instance of malpractice regardless of the number of individual claimants. And the Legislature could have reasonably believed that this increased predictability would more effectively decrease medical malpractice insurance rates, thereby keeping more physicians in Florida to provide more access to quality health care (including high-risk procedures) at a lower cost to Floridians.

As a federal district court ably stated when rejecting a similar per incident argument regarding the same statutory cap at issue here,

> [t]he aggregate limit on non-economic damages—applying to each incident regardless of the number of claimants—serves precisely the same legitimate interest served by individual caps: by reducing damage awards, limits on damages make medical malpractice insurance more affordable and quality healthcare services more available. A cap applicable to each occurrence, in cooperation with caps individually applicable to each claimant, reduces damage awards as a matter of mathematical certainty, enhances needed predictability, places a calculable limit on the exposure of healthcare and insurance providers, reduces malpractice insurance premiums, and promotes the availability of quality healthcare.

M.D. v. United States, 745 F. Supp. 2d 1274, 1280-81 (M.D. Fla. 2010).

McCall also argues that the noneconomic damages cap violates equal protection because the more severely injured may not recover their full damages, unlike those whose damages fall under the cap. However, if this were an equal protection violation, no cap on damages could survive equal protection review because all caps have that effect. And this Court has rejected equal protection challenges to caps on damages previously. See Echarte, 618 So. 2d 189; see also Phillipe, 769 So. 2d 961. In fact, in Echarte, this Court rejected an equal protection challenge under the Florida Constitution to statutory caps on noneconomic damages when the parties and amici advanced the precise argument that McCall raises here, namely that the noneconomic damages cap discriminated against the most severely injured. Therefore, under this Court's precedent, McCall's equal protection argument based upon the fact that some may not fully recover is without merit. Ultimately, "the Legislature simply may have felt that it was fairer to malpractice plaintiffs in general to reduce only the very large noneconomic damage awards, rather than to diminish the more modest recoveries for pain and suffering and the like in the great bulk of cases." Fein, 695 P.2d at 683.

Rather than applying the analysis prescribed by our precedent, the plurality concludes that the statutory cap is "unfair" and "purely arbitrary" by citing two other state supreme courts and improperly relying on dicta from our decision in Phillipe, while ignoring the fact that this Court in Samples very recently rejected

an argument that was nearly identical to the dicta expressed in Phillipe. See plurality op. at 9-13 (Lewis, J.).

Even more disturbingly, and as acknowledged by Justice Pariente to be inappropriate and unprecedented,[13] Justice Lewis' plurality opinion addresses McCall's equal protection challenge by conducting a de novo review of medical malpractice issues, overruling the findings made by the Legislature, and disregarding the evidence upon which those findings were based. Justice Lewis' plurality opinion reweighs the evidence and disbelieves the Governor's Task Force as well as the legislative testimony, claiming that its own independent review has revealed that the other two branches were incorrect and that a "bona fide medical malpractice crisis" probably did not and certainly does not currently exist. See id. at 18-28, 35-40. Additionally, despite the Legislature's and the Task Force's conclusions on the matter after reviewing the evidence, this plurality's independent review has revealed that the "available data" "failed to establish a direct correlation between damage caps and reduced malpractice premiums." Id. at 28, 35.

---

13. See concurring in result op. at 54 (Pariente, J.) ("[T]here is simply no precedent for this Court to engage in its own independent evaluation and reweighing of the facts and legislative policy findings, as done by the plurality, when conducting a rational basis analysis.").

While the plurality clearly would have come to a different policy choice than the Legislature based upon the hardly unambiguous data[14] that the plurality could cull from the record and the internet, that is not the point. Instead, our precedent dictates that we employ the rational basis test, which is a relatively easy test for a statute to pass and which recognizes and respects the Legislature's role as the primary policymaker in our constitutional system. See McElrath v. Burley, 707 So. 2d 836, 839 (Fla. 1st DCA 1998) (explaining that the rational basis test provides "minimal scrutiny" under which the challenger bears "a heavy burden"); see also Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307, 314 (1976) ("This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one."). In fact, the rational basis standard is less stringent than the deferential competent substantial evidence standard we employ when reviewing

---

14. Justice Lewis notes that medical malpractice filings have decreased significantly since fiscal year 2003-04 and that Florida, according to a 2011 report, is now retaining a fairly high percentage of Florida-trained medical students. See plurality op. at 36-37 (Lewis, J.). While he uses this information to support the plurality's argument that the statutory caps are no longer justified because a medical malpractice crisis does not currently exist, this information just as easily (and perhaps more likely) supports the argument that the cap has had its intended effect and that, if the cap is eliminated, the medical malpractice crisis would return in full force.

our own branch's findings of fact.[15]  Under the rational basis standard, there just has to be a conceivable factual predicate that would provide a rational reason for the Legislature to have done what it chose to do.  See Fla. High School Activities Ass'n, 434 So. 2d at 308 ("The burden is upon the party challenging the statute . . . to show that there is no conceivable factual predicate which would rationally support the classification under attack. . . .").  The statute does not need to be supported by unequivocal evidence in the record from the point in time when the statute was enacted or by more recent and allegedly authoritative reports posted on the internet.  In other words, as Justice Pariente's concurring in result opinion recognizes, this Court is not supposed to conduct an independent review of available data.  See Heller v. Doe, 509 U.S. 312, 320 (1993) ("A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification.  '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.' ") (quoting F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993)).  Rather, if

_____

15.  Of course, there is competent substantial evidence to support the Legislature's findings of fact.  For example, one actuary testified before the Governor's Task Force that "[m]aking losses more predictable is a key to attracting companies to provide coverage, and it is also a key to getting more stable pricing in the marketplace."  And there was testimony that "[i]n Georgia, physicians pay from $5,000 to $6,000 for $1,000,000 of coverage.  Thirty miles south, in Jacksonville, that costs $27,000."  Moreover, "[i]n one instance, a Fort Lauderdale pediatric orthopedic surgeon's premiums went from $32,000 to $96,000 a year," and, due to the increase, the surgeon planned to move to a state with tort reform.

we can conceive of a possible factual predicate that provides a rational basis in furtherance of a legitimate state interest, the statute does not violate the equal protection provision of the Florida Constitution.

Here, applying the proper rational basis test, it is clear that the cap on noneconomic damages passes muster because it is rationally related to the legitimate state interest of decreasing medical malpractice insurance rates and increasing the affordability and availability of health care in Florida. Accordingly, I would answer the Eleventh Circuit's equal protection question in the negative and then address its access to courts, jury trial, and separation of powers questions.

## IV. Access to Courts

Relying on this Court's decision in Smith v. Department of Insurance, 507 So. 2d 1080 (Fla. 1987), McCall contends that section 766.118(2)'s $1 million cap on noneconomic damages does not satisfy the access to court test set forth in Kluger v. White, 281 So. 2d 1 (Fla. 1973). I would hold otherwise.

Section 21 of article I of the Florida Constitution provides that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." In Kluger, 281 So. 2d at 4, this Court enunciated the following test for determining whether a statute violates this constitutional guarantee:

> [W]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of

the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.

In other words, to survive an access to courts challenge, a statute eliminating redress for an injury must satisfy at least one of two possible prongs: (1) either the statute must provide a reasonable alternative to redress the injury involved, or (2) the Legislature must show that there was "an overpowering public necessity for the abolishment" and that there was "no alternative method of meeting such public necessity." Id.

In Echarte, 618 So. 2d 189, this Court applied the second prong from Kluger to hold that the statutory caps on noneconomic damages in medical malpractice cases when a party requests arbitration do not violate the right of access to courts. Specifically, this Court upheld the $250,000 cap on noneconomic damages if the parties agree to voluntary binding arbitration as well as the $350,000 cap if the plaintiff refuses a defendant's offer to arbitrate. In its analysis, this Court in Echarte ruled that the first Kluger alternative was satisfied because "[t]he defendant's offer to have damages determined by an arbitration panel provides the claimant with the opportunity to receive prompt recovery without the risk and uncertainty of litigation or having to prove fault in a civil trial." Echarte, 618 So.

2d at 194. Next, this Court held that "[e]ven if the medical malpractice arbitration statutes at issue did not provide a commensurate benefit, we would find that the statutes satisfy the second prong of Kluger." Id. at 195.

In Echarte, this Court explained that the judiciary exercises restraint when reviewing the legislative findings necessary to satisfy the second prong of Kluger. Specifically, this Court stated the "legislative determinations of public purpose and facts are presumed correct and entitled to deference, unless clearly erroneous." Id. at 196. This Court explained that "[t]he Legislature has the final word on declarations on public policy, and the courts are bound to give great weight to legislative determinations of facts." Id.

This Court in Echarte began its discussion of the legislative showing of an overwhelming public necessity by explaining that the preamble to the statute at issue "clearly states the Legislature's conclusion that the current medical malpractice insurance crisis constitutes an 'overpowering public necessity.' " Id. This Court also noted that the "Legislature made a specific factual finding that '[m]edical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased unavailability of malpractice insurance for some physicians.' " Id. (quoting § 766.201(1)(a)). Then, this Court concluded that the Legislature's findings were supported by the work of the Academic Task Force for Review of the Insurance and Tort Systems, which found, among other things,

that "a family physician who performs no surgery and practiced outside Dade and Broward Counties saw a 229% increase in medical malpractice insurance premiums." Id. This Task Force had based its findings upon seven public hearings and meetings as well as surveys, research projects, and a literature review. Id. at 196 n.17. Based upon this record, this Court concluded that "the Legislature has shown that an 'overpowering public necessity' exists." Id. at 196-97.

Additionally, despite the lack of an express legislative finding on the matter, this Court in Echarte held that "the record supports the conclusion that no alternative or less onerous method exists." Id. at 197. This Court noted that "in determining whether no alternative means exists to meet the public necessity of ending the medical malpractice crisis, the plan as a whole, rather than focusing on one specific part of the plan, must be considered." Id. This Court explained that the Task Force believed that "reforms of the civil justice system, of the medical regulatory system, and of the insurance system complement each other" and that "all are necessary to address the complex problems with multiple causes" of the medical malpractice insurance crisis. Id. (quoting the Task Force's recommendations to the Legislature). And this Court in Echarte rejected the contention that professional discipline alone would have been an alternative method to meet the public necessity at issue, explaining that "the Task Force specifically found that: '[s]trengthened regulation of medical care providers is not

- 82 -

a substitute for tort and insurance reform.' " Id. (quoting Task Force).  "The Task Force specifically stated that even though a small percentage of the physicians were responsible for 42.2% of the total claims paid out, the facts did not support the conclusion that these doctors were incompetent." Id.  Thus, because it was "clear that both the arbitration statute, with its conditional limits on recovery of noneconomic damages, and the strengthened regulation of the medical profession are necessary to meet the medical malpractice insurance crisis," this Court in Echarte held that the second prong of Kluger was satisfied.  Id.

Similar to Echarte, the Legislature when enacting the statute at issue in this case expressly found that "Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude" and that "making high-quality health care available to the citizens of this state," "ensuring that physicians continue to practice in Florida," and "ensuring the availability of affordable professional liability insurance for physicians" are overwhelming public necessities.  Ch. 2003-416, at § 1.  The Legislature specifically found that "Florida is among the states with the highest medical malpractice insurance premiums in the nation" and that "the cost of medical malpractice insurance has increased dramatically during the past decade and both the increase and the current cost are substantially higher than the national average." Id.  Further, the Legislature determined that "the increase in medical malpractice liability insurance rates is forcing physicians to practice

medicine without professional liability insurance, to leave Florida, to not perform

high-risk procedures, or to retire early from the practice of medicine." Id.

These Legislative findings of an overwhelming public necessity are

supported by the determinations of the Governor's Task Force. For example, in its

report, the Governor's Task Force concluded that the cost of medical malpractice

insurance had increased dramatically, explaining the following particulars:

> In 2002 the average medical malpractice premium per doctor in
> Florida was 55 percent higher than the national average. Florida's
> average insurance premiums have increased 64 percent since 1996
> while nationally the average insurance premiums have increased 26
> percent.

Gov.'s Task Force Rep. at v. The Task Force received specific testimony

indicating that "[i]n Georgia, physicians pay from $5,000 to $6,000 for $1,000,000

of coverage. Thirty miles south, in Jacksonville, that costs $27,000." Id. at 76.

And the Task Force noted that:

> [t]he Professional Medical Insurance Services, Inc., underwriters for
> Florida physicians, estimates that, in 2003, for OB/GYNs who
> presently have coverage, costs for $1 million dollar[s] of coverage
> will average between $70,000 and $110,000 per year; $250,000 of
> coverage will cost between $50,000 and $60,000 per year. For
> OB/GYNs seeking new insurance in 2003, estimates show that $1
> million dollars in coverage will cost $150,000 per year[] and $250,000
> in coverage will cost between $90,000 and $107,000 per year. As a
> result of these escalating costs, physicians are simply either under
> insuring or becoming uninsured with regard to their practices.

Id. at 306. The Task Force found that "[i]n Miami, evidence reflects that 80

percent of the OB/GYNs carry no insurance and those who do are paying over

$207,000 per year for $1 million dollars worth of coverage." Id. And "[t]he number of insurance companies writing medical malpractice policies in Florida went from a high of sixty-six companies in 1999 to twelve currently." Id. at v. The Task Force also described testimony indicating that, as a result of these issues, over half the doctors in Florida that carry insurance can only afford to carry a $250,000 policy even though the most prevalent rate in the rest of the country is for a doctor to carry a $1,000,000 policy. Id. at 76. The Task Force further found that "[t]he concern over litigation and the cost and lack of medical malpractice insurance have caused doctors to discontinue high-risk procedures, turn away high-risk patients, close practices, and move out of the state." Id. at vi. Indeed, "[i]n Broward County alone, 400 physicians have left the state, or retired early in the past year." Id. at 72. The Task Force learned that "[i]n one instance, a Fort Lauderdale pediatric orthopedic surgeon's premiums went from $32,000 to $96,000 a year." Id. Due to this increase, the surgeon reported a plan "to return to his home state, Louisiana, as that state has tort reform." Id. Therefore, because the Legislature's factual and policy findings are presumed correct (as explained in Echarte), and because (as in Echarte) these findings are supported by the work of the Governor's Task Force, the Legislature has shown the existence of an "overpowering public necessity."

Regarding the "no alternative method" showing necessary to satisfy the second prong of Kluger, the Legislature expressly found that "the overwhelming public necessities of making quality health care available to the citizens of this state, of ensuring that physicians continue to practice in Florida, and of ensuring that those physicians have the opportunity to purchase affordable professional liability insurance cannot be met unless a cap on noneconomic damages is imposed." Ch. 2003-416, at § 1(14), Laws of Fla. The Legislature determined that "the high cost of medical malpractice claims can be substantially alleviated by imposing a limitation on noneconomic damages" and that "there is no alternative measure of accomplishing such result without imposing even greater limits upon the ability of persons to recover damages for medical malpractice." Ch. 2003-416, at § 1(15), (16), Laws of Fla. The Legislature also found that "each of the provisions of this act is necessary to alleviate the crisis relating to medical malpractice insurance." Ch. 2003-416, at § 1(18), Laws of Fla.

The record supports these legislative findings and determinations. For instance, the Governor's Task Force stated that, "without the inclusion of a cap on potential awards of non-economic damages in the package, no legislative reform plan can be successful in achieving a goal of controlling increases in healthcare costs and thereby promoting improved access to healthcare." Gov.'s Task Force

Rep. at 218. The Task Force noted that various other alternatives had been tried

previously without success:

> Since 1975, Florida has implemented (or attempted to implement) numerous alternatives to the cap on non-economic damages and the other reforms recommended in this Report. None, alone or together with the others, has solved the crisis of medical malpractice insurance availability and affordability. Instead, Florida's numerous attempts to solve this problem are nothing more than a failed litany of alternatives.

Id. at 219.

The Task Force explained that "one of the primary drivers of the current

medical malpractice crisis is that a large percentage of medical malpractice losses

(77 percent in Florida) apply to non-economic damages (i.e., pain and suffering)."

Id. at 212. The Task Force also stated its belief that "caps on non-economic

damages are particularly effective, because they limit the escalation of awards for

pain and suffering, which fuels large increases for all awards and settlements." Id.

In fact, the Task Force thought that a cap on noneconomic damages was so

important to alleviating the crisis and lowering premiums that it recommended a

$250,000 per incident cap on noneconomic damages, rather than the $1 million per

incident cap at issue in this case. See id. at xi. Based upon this record, the

Legislature has shown that "no alternative or less onerous method exists." Echarte,

618 So. 2d at 197.

Accordingly, because the Legislature has shown an overpowering public necessity for the cap on noneconomic damages and that there is no alternative method of meeting the public necessity, the second prong of Kluger (as applied in Echarte) is satisfied. Therefore, section 766.118(2)(b) does not violate the right of access to court guaranteed by the Florida Constitution.

**V. Jury Trial**

McCall also contends that the cap on noneconomic damages violates the right to a jury trial guaranteed by the Florida Constitution. However, I would disagree and therefore answer the Eleventh Circuit's certified question in the negative.

Article I, section 22 of the Florida Constitution provides that "[t]he right of trial by jury shall be secure to all and remain inviolate." Florida's "first constitution of 1838, which became effective upon Florida's admittance to the Union in 1845, and all subsequent constitutions have contained similar provisions." In re 1978 Chevrolet Van, 493 So. 2d 433, 434 (Fla. 1986). Thus, section 22 of article I "guarantees the right to trial by jury in those cases in which the right was enjoyed at the time this state's first constitution became effective in 1845." Id.

This right to a jury trial is not implicated here because survivors of a wrongful death did not have the right to recover noneconomic damages in 1845.

- 88 -

"It is well known that at common law the cause of action died with the person and that a parent had no right of action as parent for the wrongful death of a minor child." Klepper v. Breslin, 83 So. 2d 587, 592 (Fla. 1955). Parents only gained this statutory right in 1899. Id. at 591. Other survivors were not entitled to recover pain and suffering damages until the Legislature enacted the Wrongful Death Act in 1972. See ch. 72-35, Laws of Fla.; Lifemark Hosps. of Fla., Inc. v. Afonso, 4 So. 3d 764, 769 (Fla. 3d DCA 2009) ("A survivor's right to recover pain and suffering did not become part of the Wrongful Death Act until 1972. . . ."); see also Martin v. United Sec. Servs., Inc., 314 So. 2d 765, 767-68 (Fla. 1975) (describing the damages that were recoverable before and after the enactment of the Wrongful Death Act in 1972). Therefore, because the petitioners would not have had the right to recover damages from Ms. McCall's death in 1845, the cap on noneconomic damages under section 766.118(2)(b) does not violate the right to a jury trial guaranteed by the Florida Constitution.

## VI. Separation of Powers

Lastly, McCall contends that the cap on noneconomic damages violates the Florida Constitution's provision ensuring separation of powers because the cap amounts to an impermissible legislative remittitur. I would reject this argument.

Article II, section 3 of the Florida Constitution provides that "[t]he powers of the state government shall be divided into legislative, executive and judicial

branches.  No person belonging to one branch shall exercise any powers

appertaining to either of the other branches unless expressly provided herein."  As

this Court has explained, "[g]enerally, the Legislature is empowered to enact

substantive law while [the judicial branch] has the authority to enact procedural

law."  Massey v. David, 979 So. 2d 931, 936 (Fla. 2008).  Therefore, "[i]f a statute

is clearly substantive and operates in an area of legitimate legislative concern, this

Court will not hold that it constitutes an unconstitutional encroachment on the

judicial branch."  Id. at 937.

In Rowlands v. Signal Construction Co., 549 So. 2d 1380, 1381-82 (Fla.

1989) (footnote omitted), this Court explained remittitur as follows:

> In its classic sense, the term "remittitur" means nothing more
> than "[t]he procedural process by which a verdict of the jury is
> diminished by subtraction."  Black's Law Dictionary 1164 (5th ed.
> 1979).  Indeed, when remittitur was created in 1822 by Justice Story,
> it was for the express purpose of subtracting a specific amount from
> an excessive verdict if the plaintiff wanted to avoid the court's
> alternative new-trial order.  Blunt v. Little, 3 F. Cas. 760, 762 (No.
> 1578) (C.C.A. Mass. 1822).  See Note, Remittitur Practice in the
> Federal Courts, 76 Colum. L. Rev. 299, 300 (1976) (discussing
> history of remittitur).  Thus, remittitur is proper where liability clearly
> exists, but the total dollar amount of damages is merely excessive.

In other words, "remittitur operates as a procedural device to bring the damages

back within the outer bounds of law."  Rowlands, 549 So. 2d at 1382 n.1.

Here, the challenged cap does not invade the province of the judiciary

because it does not operate as a legislative remittitur.  The statutory cap establishes

a limit to noneconomic damages in medical malpractice cases generally. It does not perform the judiciary's function of reviewing the specific support for particular damage awards in individual cases. Accordingly, "[b]ecause the challenged law does not purport to vest the Legislature with authority to make a fact intensive, case-by-case determination of the propriety of damage awards in individual cases, it does not usurp the authority of the judiciary." M.D., 745 F. Supp. 2d at 1281.

Moreover, in Smith, 507 So. 2d at 1092, this Court rejected the argument that statutory limitations on punitive damages violated Florida's separation of powers provision. See also Echarte, 618 So. 2d at 191 (holding that the caps on noneconomic damages in medical malpractice cases where a party offers arbitration do not violate "the non-delegation doctrine"); Cauley, 403 So. 2d at 387 (holding that caps on damages in tort cases against municipalities do not violate "the separation of powers rule"). This Court in Smith explained that "[w]hen the legislature enacted these provisions, it was addressing the substantive rights of plaintiffs and defendants in civil litigation actions with regard to recovery of damages." 507 So. 2d at 1092. This Court also approved the following reasoning the trial court employed when rejecting the separation of powers claim:

> Sections 51 and 52 deal with the subject of punitive damages. Section 51 defines the conditions the plaintiff must meet to recover punitive damages. Section 52 limits the amount of punitive damages available in certain civil actions. In addition, section 52 specifies who shall receive any punitive damages so awarded. Section 51 is clearly substantive because it sets the standard for establishing a claim for

punitive damages. The legislature, which has the authority to abolish punitive damages can surely set the standard for establishing such claims. The Court is of the view that both sections create substantive rights and further that any procedural provisions of these sections are intimately related to the definition of those substantive rights.

Id. at 1092 n.10.

Like the punitive damages statute at issue in Smith, the statutory cap on noneconomic damages at issue here addresses the substantive rights of parties with regard to the recovery of damages. And because section 766.118(2)(b) addresses substantive rights, it does not violate the separation of powers clause of the Florida Constitution.

## VII. Conclusion

As explained above, the plurality chooses to disregard the rational basis standard prescribed by our precedent as well as the Legislature's policy role under Florida's constitution. Under our precedent, Florida's per incident cap for a wrongful death action does not violate Florida's constitutional guarantees of equal protection, access to courts, jury trial, and separation of powers. Therefore, I would answer the certified questions from the Eleventh Circuit in the negative. I respectfully dissent.

CANADY, J., concurs.

Certified Question of Law from the United States Court of Appeals for the Eleventh Circuit - Case No. 07-00508CV-3-MCR/EMT

Henry T. Courtney and Sara Courtney-Baigorri of Courtney Law Firm, Coral Gables, Florida; Stephen S. Poche of The Law Office of Stephen S. Poche, P.A., Shalimar, Florida; and Robert S. Peck and Valerie M. Nannery of Center for Constitutional Litigation, P.C., Washington, District of Columbia,

for Appellants

Tony West, Assistant Attorney General, Pamela C. Marsh, United States Attorney, Daniel J. Lenerz and Thomas M. Bondy, Attorneys, Appellate Staff Civil Division, United States Department of Justice, Washington, District of Columbia; and Pamela A. Moine, United States Attorney's Office, Pensacola, Florida,

for Appellee

Raoul G. Cantero and David P. Draigh of White & Case LLP, Miami, Florida,

for Amici Curiae Coral Gables Hospital, Delray Medical Center, Good Samaritan Medical Center, Hialeah Hospital, North Shore Medical Center, North Shore Medical Center-FMC Campus, Palm Beach Gardens Medical Center, Palmetto General Hospital, St. Mary's Medical Center and West Boca Medical Center

Thomas E. Warner and Dean A. Morande of Carlton Fields, P.A., West Palm Beach, Florida,

for Amicus Curiae HCA Health Services of Florida, Inc.

Fred J. Hiestand, Sacramento, California,

for Amicus Curiae The Civil Justice Association of California

Jennifer A. Tschetter, General Counsel, Florida Department of Health, Tallahassee, Florida; M. Drew Parker, General Counsel, and John Slye, Acting General Counsel, Florida Department of Children & Families, Tallahassee, Florida; Dean C. Kowalchyk, General Counsel, Florida Department of Elder Affairs, Tallahassee, Florida; William H. Roberts, Acting General Counsel, Florida Agency for Health Care Administration, Tallahassee, Florida; and Mike Palecki, General Counsel, Florida Department of Agency for Persons with Disabilities, Tallahassee, Florida,

for Amici Curiae Surgeon General Frank Famer and Florida's Healthcare Agencies

William W. Large, Tallahassee, Florida,

for Amicus Curiae Florida Justice Reform Institute

Stephen Hogge of Stephen Hogge, Esq., LLC, Tallahassee, Florida,

for Amicus Curiae Professor Paul H. Rubin

George N. Meros, Jr. and Allen Winsor of GrayRobinson PA, Tallahassee, Florida,

for Amici Curiae Florida College of Emergency Physicians and The Florida Orthopaedic Society

Mark Hicks, Dinah Stein, and Shannon Kain of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, Florida,

for Amicus Curiae Florida Medical Association

Arthur J. England, Jr. and Christopher B. Carbot of Greenberg Traurig, P.A., Miami, Florida; Mark K. Delegal and Cynthia S. Tunnicliff of Pennington, Moore, Wilkinson, Bell & Dunbar, P.A., Tallahassee, Florida,

for Amici Curiae The Florida Hospital Association and The Safety Net Hospital Alliance of Florida

Pamela Jo Bondi, Attorney General and Diane G. DeWolf, Deputy Solicitor General, Office of the Attorney General, Tallahassee, Florida,

for Amicus Curiae The State of Florida

Christopher L. Nuland and Brian Hart of Law Offices of Christopher L. Nuland, P.A., Jacksonville, Florida,

for Amici Curiae The Florida Chapter of the American College of Physicians, Florida Chapter of the American College of Surgeons, Florida Obstetric and Gynecologic Society, Florida Society of Plastic Surgeons, Florida Society of Thoracic and Cardiovascular Surgeons, Florida

Neurosurgical Society, Florida Society of General Surgeons, Florida Society of Dermatology and Dermatologic Surgery and Florida Gastroenterologic Society

Michael L. Rosen of Shook Hardy & Bacon L.L.P., Tampa, Florida; Mark A. Behrens and Cary Silverman of Shook Hardy & Bacon, Washington, District of Columbia,

> for Amici Curiae American Medical Association, American Academy of Orthopaedic Surgeons, American Congress of Obstetricians and Gynecologists, Chambers of Commerce of the United States of American, Health Coalition on Liability and Access, Physicians Insurers Association of America, Property Casualty Insurers Association of America, National Association of Mutual Insurance Companies, and NFIB Small Business Legal Center

Lincoln J. Connolly of Rossman, Baumberger, Reboso, Spier & Connolly, P.A., Miami, Florida,

> for Amici Curiae Floridians for Patient Protections, Inc. and Florida Consumer Action Network, Inc.

Barbara W. Green of Barbara Green, P.A., Coral Gables, Florida; and Joel S. Perwin of Joel S. Perwin, P.A., Miami, Florida,

> for Amici Curiae The Florida Justice Association, AARP, Florida AFL-CIO, and Florida Public Employee Council 79, AFSCME, AFL-CIO

John S. Mills and Andrew D. Manko of The Mills Firm, P.A., Tallahassee, Florida

> for Amici Curiae Professors Neil Vidmar, Tom Baker, Ralph L. Brill, Martha Chamallas, Stephen Daniels, Thomas A. Eaton, Theodore Eisenberg, Marc Galanter, Valerie P. Hans, Edward J. Kionka, Thomas Koenig, Herbert Kritzer, Nancy S. Marder, Joanne Martin, Frank M. McClellan, Deborah Jones Merritt, James T. Richardson, and Michael L. Rustad

Stephen N. Zack, President, American Bar Association, Chicago, Illinois; and Herman J. Russomanno, Robert J. Borrello, Herman J. Russomanno III,  of Russomanno & Borrello P.A., Miami, Florida,

for Amicus Curiae The American Bar Association

George S. Christian, Austin, Texas,

for Amicus Curiae Texas Civil Justice League